**GOLDING–KEENE COMPANY, The Feldspar Corporation**

v.

**UNITED STATES (E. Dillingham, Inc., a/c Rheem Mfg. Co., Party in Interest).**

**C.D. 1175; Protest No. 59/20332.**

United States Customs Court, First Division. April 28, 1960.

948

Edwin G. Martin, Washington, D. C., for plaintiffs.

George Cochran Doub, Asst. Atty. Gen. (Mollie Strum, New York City, Trial Atty.), for defendant.

Barnes, Richardson & Colburn, New York City, Covington & Burling, Washington, D. C., Associate Counsel (Joseph Schwartz, New York City, Donald Hiss and Priscilla Holmes, Washington, D. C., of counsel), for party in interest.

Before OLIVER, Chief Judge, and MOLLISON and WILSON, Judges.

OLIVER, Chief Judge.

This protest was filed pursuant to the provisions of section 516(b) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (T.D. 49646) and Public Law 773 (62 Stat. 869), 19 U.S.C.A. § 1516(b), which grants to manufacturers, producers, or wholesalers the privilege of challenging by protest the classification of, and the rate of duty imposed upon, imported merchandise of a class or kind "manufactured, produced, or sold at wholesale by him."

The statute, section 516(b), as amended, so far as pertinent, reads as follows:

[Sec. 516] (b) Classification.— "The Secretary of the Treasury shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification of, and the rate of duty, if any, imposed upon, designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary, setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief. If the Secretary decides that the classification of, or rate of duty asessed upon, the merchandise is not correct, he shall notify the collectors as to the proper classification and rate of duty and shall so inform the complainant, and such rate of duty shall be assessed upon all such merchandise entered for consumption or withdrawn from warehouse for consumption after thirty days after the date such notice to the collectors is published in the weekly Treasury Decisions. If the Secretary decides that the classification and rate of duty are correct, he shall so inform the complainant. If dissatisfied with the decision of the Secretary, the complainant may file with the Secretary, not later than thirty days after the date of such decision, notice that he desires to protest the classification of, or rate of duty assessed upon, the merchandise. Upon receipt of such notice from the complainant, *the Secretary shall cause publication to be made of his decision as to the proper classification and rate of duty and of the complainant's desire to protest, and shall thereafter furnish the complainant with such information as to the entries and consignees of such merchandise, entered after the publication of the decision of the Secretary at the port of entry designated by the complainant in his notice of desire to protest, as will enable the complainant to protest the classification of, or rate of duty imposed upon, such merchandise in the liquidation of such an entry at such port. The Secretary shall direct the collector at such port to notify such complainant immediately when the first of such entries is liquidated.* Within thirty days after the date of mailing to the complainant of notice of such liquidation, the complainant may file with the collector at such port a protest in writing setting forth a description of the merchandise and the classification and rate of duty he believes proper. * * * " [Italics supplied.]

Treasury regulations, issued pursuant to the foregoing statutory provisions, provide, in part, as follows:

"17.11 American producers' appeals and protests; procedure.—

* * * * * *

"(c) Notice of the liquidation of the first of the entries to be liquidated, covering merchandise of a class or kind which would enable the complainant to present the issue desired, shall be given to the complainant by the collector, as required by section 516(b), Tariff Act of 1930, as amended. *If, upon examination of the information secured by the collector as to this entry and inspection of the sample, if any, the complainant believes and the collector agrees that the merchandise or the facts surrounding this importation are not sufficient to raise the issue involved in the complaint, the collector shall then give the complainant notice of the first liquidation thereafter of such an entry as will permit the framing of the issue covered by the complaint, and shall, under the same conditions, continue to give such notices for so long as he is of the opinion that the complainant is sincere in his desire to protest.*" [Italics supplied.]

The merchandise in question consists of ground nepheline syenite of 200 mesh, which was admitted free of duty under the provision in paragraph 1775 of the Tariff Act of 1930, 19 U.S.C.A. § 1201, par. 1775, for manufactured sand. Plaintiffs, American manufacturers, claim that the commodity should be dutiable under the provision for ceramic fluxes, ground or pulverized, in paragraph 231, 19 U.S.C.A. § 1001, par. 231 either as originally enacted, with a duty assessment of 30 per centum ad valorem, or as modified, carrying a dutiable rate of 12½ per centum ad valorem.

■ Counsel for the party in interest have moved for dismissal of the protest on the ground that plaintiffs have failed to comply with the requirements of the statute. Three reasons are presented for the motion. Two of them relate to the element of timeliness. In this connection, it is alleged (1) that the protest before the court is not directed against the first entry following the decision of the Secretary of the Treasury denying the complaint of the American manufacturers and (2) that the merchandise, the subject of the entry under consideration, was entered prior to the publication of the decision of the Secretary of the Treasury.

The decision of the Secretary of the Treasury, rejecting plaintiffs' complaint alleging that the proper classification of the present merchandise is under paragraph 231, was published under date of December 19, 1958 (93 Treas. Dec. 588, T.D. 54755). It is undisputed that the collector of customs at the port of Buffalo, N. Y., in notifying plaintiffs, as he did, of the entry of nepheline syenite covered by entry 09977, dated January 27, 1959, liquidated on February 12, 1959, gave notice of the first of the entries of such merchandise following the decision of the Secretary of the Treasury, T.D. 54755, supra. Plaintiffs concede that they received proper notice of the Buffalo entry, but filed no protest against that entry, because no sample of the merchandise covered thereby was available. The need for a sample is stated in plaintiffs' memorandum in opposition to the motion to dismiss, as follows: "To try to prove to the Court that merchandise classified as sand is in reality a ceramic flux would be the height of folly unless plaintiffs had evidence of the characteristics of the merchandise which evidence can only be obtained by chemical analysis and other examination of a sample." It is shown herein that plaintiffs made a diligent effort, through customs officials as well as from the importer, to obtain a sample of the merchandise covered by the cited Buffalo entry, but were unsuccessful. Explaining why plaintiffs did not designate a port of entry in their notice of desire to protest, counsel, in his affidavit supporting the memorandum in opposition to the motion to dismiss, states that plaintiffs "believed that such merchandise may be entered at Detroit or Buffalo," but they "did not know whether the material imported at those ports was 200 mesh or finer, and accordingly could not designate Detroit and Buffalo as ports of entry."

Plaintiffs made request for another notice of liquidation, which was complied with. The notice received by plaintiffs pursuant to their later request was the liquidation of the entry covered by the protest involved herein. This entry was made at the port of Ogdensburg, N. Y., under date of December 9, 1958, and it was liquidated on May 27, 1959. The protest was filed on June 19, 1959, or 23 days after the date of liquidation and within the time allowed by the statute.

Counsel for the party in interest argue that the present protest is untimely because it was "filed June 17, 1959, a lapse of approximately one hundred twenty-seven days from the date of the liquidation of the first appropriate entry." The "appropriate entry" referred to is the Buffalo entry, hereinabove discussed, which did not enable plaintiffs to present the issue desired and, therefore, cannot control statutory requirements necessary to invoke the provisions of section 516 (b), as amended, supra. When the cited Buffalo entry lost its effectiveness as the basis for litigation of plaintiffs' claim, the date of notice of liquidation thereof could not become the focal date from which valid protest should lie. Pertinent Treasury regulations (17.11), supra, require that the collector shall continue to give the complainant notice of the first liquidation "of such an entry as will permit the framing of the issue covered by the complaint." So far as plaintiffs were concerned, the entry under consideration was sufficient. This was the first entry, following publication of the Secretary's decision, T.D. 54755, supra, that met the provisions of section 516(b), as amended. Since the protest now before us was filed within 30 days after the notice of the liquidation of that entry, it is timely within the requirements of the statute.

The motion for dismissal of the party in interest is also based on the contention that plaintiffs are not manufacturers, producers, or wholesalers of merchandise of the same class or kind as the imported nepheline syenite involved herein. The record before us shows that plaintiffs are American manufacturers of ground feldspar of 200 mesh or finer, a material or substance that is directly competitive with, and substitutable for, the nepheline syenite under consideration. That the two commodities have different chemical formulas, is not the controlling consideration. The statute does not require that plaintiffs' merchandise shall be identical with the imported goods. Section 516(b), as amended, uses the relatively broad term, "class or kind," suggesting comparatively wide latitude for parties to invoke the privilege granted thereunder. In this case, the record includes evidence to the effect that the two kinds of merchandise are sold to the same class of purchasers and are used for the same purpose. It is our opinion that plaintiffs, as American manufacturers of feldspar, are entitled to maintain the present protest directed against the tariff classification of imported nepheline syenite. See Star-Kist Foods, Inc. v. United States (Bruno Scheidt, Inc., Party in Interest), 45 CCPA 16, C.A.D. 666.

To support the motion to dismiss, counsel for the party in interest have cited several cases that involved the provisions of section 516(b) of the Tariff Act of 1930, either as originally enacted or as modified. Reed & Barton et al. v. United States, 63 Treas. Dec. 941, T.D. 46422; Porcelain Enamel Institute v. United States (Langlotz & Co., Inc., Party in Interest), 64 Treas. Dec. 478, T.D. 46713; American Manufacturing Co. v. United States (Burka Bagging Co., Party in Interest), 62 Treas. Dec. 305, T.D. 45924; The Cronite Co., Inc. v. United States (W. E. Sellers, etc., Party in Interest), 38 Cust.Ct. 76, C.D.1847, affirmed in W. E. Sellers (Party in Interest, Doing Business as John Sellers & Sons) v. The Cronite Co., 45 CCPA 27, C.A.D. 668 (cross-appeal); E. C. Miller Cedar Lumber Co. v. United States (J. F. Sharp Lumber Co. et al., Parties in Interest), 24 CCPA 282, T.D. 48702. All of those cases were based on specific facts pertinent to the particular situation involved. To review any of them at this time would unduly lengthen this discussion.

For all of the reasons hereinabove set forth, the motion to dismiss is denied.

Counsel for the respective parties stipulated that the merchandise in question is the same in all material respects as the nepheline syenite which was the subject of this court's decisions in V. J. Cronin v. United States, 4 Cust.Ct. 86, C.D. 293, and Great Lakes Foundry Sand Co. et al. v. United States, 9 Cust.Ct. 170, C.D. 685. In each of those cases, the merchandise was classified as an earthy or mineral substance and was claimed to be free of duty under the provision for sand, manufactured. In both cases, plaintiffs' claim was sustained. In the brief of the party in interest herein, counsel point out that "These court cases have been followed by the Treasury Department, and since at least 1946 and Treasury Decision 51462(1) *all* ground nepheline syenite has been classified in paragraph 1775 [italics quoted]," and contend that, under the doctrine of *stare decisis,* the collector's classification of the present merchandise should be sustained.

■ Plaintiffs' claim herein that this nepheline syenite is properly classifiable under the provision for ceramic fluxes was not presented in either of the two cited cases. It comes before the court for the first time in this case. The issue presented thereby is materially different from that which was involved in the previous cases. In United States v. R. J. Saunders & Co., Inc., 42 CCPA 128, C.A.D. 584, the Court of Customs and Patent Appeals stated as follows:

"The doctrine of *stare decisis* rests on the underlying philosophy that any judicial statement, however broad, must be understood in its context, and as applying to the facts of the case. It is not to be expanded to embrace, as well, a factual situation other than, different from, and contrary to, the facts of the case to which the language applies and is used."

In this case, the factual situation, as well as the legal propositions, are different from those that were considered in the two cited cases. The doctrine of *stare decisis* has no application herein. We proceed to review the record.

It was stipulated between the parties that the merchandise in question consists of ground nepheline syenite of 200 mesh. (R. 129–130.) The identification, "of 200 mesh," connotes a product whose particles are fine enough, essentially, to pass through a sieve having 200 openings to the linear inch, each opening measuring across approximately three one-thousandths of an inch.

Plaintiffs' first witness—and their principal witness—was the vice president and technical director of the United Clay Mines Corp. of Trenton, N. J., a manufacturer and refiner of clays, and also engaged in the sale of feldspar. The witness stated that he has been associated with his employer since 1939 and that, during the period of his employment, he has worked as chief ceramic engineer, having charge of the laboratory facilities directed toward maintenance of the quality of manufactured materials, and working with customers, or potential customers, on ceramic problems that may involve body or formula development, raw materials, or engineering problems. His testimony will support the following.

A ceramic is a nonmetallic material subjected to heat in the process of forming. It includes glass articles, as well as articles that are formed before heat is applied. A ceramic body is a mixture of ceramic raw materials used in forming a ceramic item. It also refers to the structural portion of a ceramic item after it has been fired or formed.

The witness' testimony relates to ceramic bodies that are formed before they are fired. In this connection, specific reference was made to ceramic whiteware, that was described as a "ceramic article which is commonly white and fired to a white texture," and would include "sanitary ware, floor tile, wall tile, dinnerware, fine china, hotel china, and things of that description." (R. 38.) Ceramic whiteware bodies are made up of clays, potter's flint, and ground flux-

ing materials. The raw materials are mixed, shaped, and dried to the required degree of vitrification in a furnace.

Vitrification refers to the glassy phase in an article, produced by progressive heat treatment. The necessity for the vitrification of ceramic whiteware was explained as follows (R. 61):

> "Well, you have considerations of mechanical strength, first of all. The ware should be electrically strong, in the case of electric porcelain. You have the consideration of health in the case of sanitary ware and dinnerware, the items have to be impervious to liquids, to prevent lodgement of bacteria. You would have aesthetic considerations in the case of fine china or in art ware. All of these come from vitrification."

Ceramic vitrified whiteware is generally a ceramic article which, when subjected to the boiling test, will absorb no more than about one-half of 1 per centum of its own weight of water. A ceramic flux is any material which is added to a ceramic body, or formula, to promote fusion or improve fusion. "It aids in the form of a glassy phase at a reasonably low temperature." (R. 44.)

Common fluxing materials of whiteware bodies are ground feldspars and ground nepheline syenite, or combinations of the two. Feldspar has been used as a ceramic flux for as long as 60 years. Nepheline syenite "was first offered to the ceramic industry * * * in 1935." (R. 64.) Feldspar is a natural rock; it is a mineral aggregate, consisting of albite, anorthite, and microline. Nepheline syenite is also a natural rock, consisting of two of the varieties of feldspar, i. e., albite and microcline, plus a "feldspathoid mineral called nepheline, which constitutes about 25 per cent of the total." (R. 47.) Feldspar and nepheline syenite are natural fluxes, used in their natural condition after crushing and grinding and removal of impurities. Both have the same kind of fluxing action in whiteware ceramic bodies. They are at their maximum strength when fired at 2,400 degrees Fahrenheit. Their use as fluxing materials induces the glassy phase of the ware, producing products of better quality and at lower costs to the manufacturer. By chemical composition, nepheline syenite is identified as a silica deficient material, possessing more alkali and less silica than feldspar, and having a greater percentage of alumina as an ingredient. A lesser quantity of nepheline syenite is necessary to produce the same result, because of the greater alkaline constituent.

Cross-examination developed that the term "flux" has a broad meaning, embracing "any material which is added to a mix to promote fusion," and that ceramic fluxes include talc, barium carbonate, borax, fluorspar, cryolite, lithium, litharge, and, under certain circumstances, sodium carbonate and boron. Nepheline syenite is not confined in its use to that of a fluxing material. It is employed as a refractory in association with a very low melting material that would tend to melt the nepheline syenite more readily. It is also used as a paint filler, as a batch ingredient in glass, and in enamel mixes.

The flux used to promote fusion in the *glaze* of whiteware is not the same kind of ceramic flux that is used to promote fusion in the *body* of whiteware. In ceramic decorating, the term, "flux," has reference to a prepared low-melting glass, usually colorless, that may be mixed with pigments to produce vitrifiable coatings on glass or clay wares. In that sense of the term, nepheline syenite is not a flux. Nepheline syenite is not used in vitrifiable colors. In decorating ceramic bodies, metal oxides are mixed with fluxing materials that make the ceramic color or colors adhere to the ware.

A frit is a specially prepared flux. In essence, it is "a glass which you have melted into a more or less fluid state and poured into water to quench it." It may be sold "as sort of a granular product, or it may be ground, but it is, in effect, a glass." (R. 87.)

Plaintiffs' second witness was the plant manager of the Rheem Manufacturing

Co. where the nepheline syenite in question was delivered. The witness testified that ground nepheline syenite, such as the commodity under consideration, has been used by the Rheem Manufacturing Co. for "about two years," that, during that period, it has been used as a flux in the body of china plumbing fixtures, and that, in such usage, it is fired up to about 2,200 degrees Fahrenheit.

The vice president and general manager of the Feldspar Corp., a manufacturer of feldspar of 200 mesh or finer, which is sold throughout the United States in competition with nepheline syenite, testified that feldspar and nepheline syenite are directly competitive and substitutable, and that each is sold as a ceramic flux. Based on his analysis of a sample (plaintiffs' exhibit 6), the witness stated that the nepheline syenite in question contained "60.50 silica, 23.11 aluminum, .09 iron, .30 calcium oxide, trace of magnesium oxide, 5.05 per cent potassium oxide, 10.18 per cent sodium oxide, .80 loss on ignition" (R. 112), from which he concluded that the merchandise had all the qualities to make it a ceramic flux. Referring to fluxes that are specially prepared for decorating, or coating, purposes, the witness testified that they fall within the general classification of frits, which include "ceramic colors, or ceramic frits or enamel frits." A frit, made up of flint, clay, feldspar or syenite, and oxides, is a flux as it binds the glaze and the body of the ware together.

The vice president in charge of sales of the Golding-Keene Co., a manufacturer of feldspar and dealer in nepheline syenite, testified that he has been associated with the sale and production of feldspar for 33 years, and that he has sold nepheline syenite since it was introduced on the market in this country. He stated that both products are directly competitive and interchangeable in use and that the principal use for nepheline syenite is in fluxing. The witness expressed agreement with previous testimony concerning the function of feldspar and nepheline syenite in ceramic bodies and the different chemical composition of the two substances.

The first witness who appeared on behalf of the party in interest was the general manager of the Canadian Feldspar Department of the International Minerals & Chemical Corp., Canada, Ltd., of Ottawa. He stated that he supervised the production of the nepheline syenite in question, which process he described as follows (R. 144):

"We strip the overburden from the rock—in this case, nepheline syenite deposit—and drill it with rock drills, and we blast the rock with dynamite into pieces that may be handled by trucks and the shovel. Where it is delivered to a mill the function of the mill is to crush, grind, size and remove the impurities in the rock, so that it may be sold to the ceramic and glass trade."

Describing the various mesh sizes into which nepheline syenite is crushed or ground, the witness testified as follows:

"We make three products at the present time, a 20-mesh, approximately, glass grade, which we call Summit; a 200-mesh, approximately again, grade, which we call Crescent Grade; and the third grade, again, minus 200-mesh, essentially, which we call Peak Grade."

In further testimony, the witness explained that, in the production of the three grades of nepheline syenite, the work is started with the natural rock, nepheline syenite, and, under crushing and grinding processes, the material is graded by means of sieves with openings of the appropriate size to suit the fineness or coarseness of the ultimate product.

The second witness called by the party in interest was a ceramic engineer, employed as the director of the research development department of the Pemco Corp. of Baltimore, Md., a manufacturer of all types of ceramic coatings and ceramic colors. The witness stated that his company uses nepheline syenite because its chemical composition, which in-

cludes soda, potassium, alumina, and silica, is satisfying as a raw material in the manufacture of frits. Explaining the term, "frit," the witness testified as follows (R. 178):

"A frit covers all of the glasses which we smelt in our plant. Some of those frits are sold to the glaze, white ware industry as glazes—they are glazed frits. Some are sold to the porcelain enamel industry—they are porcelain enamel frits. Some are sold to the glass industry—those are glass enamel frits. Some have been sold for various decorating, and they are the fluxes for decorating, but they are frits, too. Frits cover all the glasses we manufacture."

All frits are specially prepared products. They are mixtures of two or more raw materials, melted together into a glass, or calcined into a ceramic stain. All are subjected to heat at temperatures "mostly above 2000 degrees Fahrenheit." (R. 163.) They are made specifically for glazing, coloring, or decorating purposes. Samples of different kinds of frits were identified. A smalt, consisting of a mixture of five raw materials that include potassium, silica, and cobalt, which are melted into a blue glass, then quenched, and finally dry-ground (party in interest exhibit E), is valuable for its cobalt content, a strong coloring oxide. A ceramic color, "Glass Color (Blue)" (party in interest exhibit D–3), made up of the mixture of "Flux (Overglaze)" (party in interest exhibit D–1) and "Color Oxide" (party in interest exhibit D–2), is used to produce vitrifiable coatings on glass or in clay wares. A ground coating enamel made to adhere to metal as a ground coating for porcelain enamel (party in interest exhibit G) and a cover coat enamel to be applied over the ground coat of porcelain enamel (party in interest exhibit H) are other items of frits.

The third witness to appear on behalf of the party in interest was a professor in the Department of Ceramic Engineering at Ohio University and also a director of research for American Nepheline, Ltd., a producer of nepheline syenite in Canada. Counsel for plaintiffs conceded that the witness is an expert in ceramics. His testimony can be summarized as follows.

Nepheline syenite is a crystalline rock, composed of albite, anorthite, and nepheline, each component being significant in amount in the mineral aggregate. Ground nepheline syenite is made into different mesh sizes. The use of nepheline syenite is based on, or controlled by, the mesh size of the substance. The most predominant size in commerce is 20 mesh, which is sold to the glass industry for its high alumina content that improves corrosion resistance and strengthens glasses. Nepheline syenite of 200 mesh, the commodity under consideration, has been used since its introduction in commercial quantities in 1937, as a flux in the body of ceramic whiteware. It is also used as a refractory in the porcelain enamel industry.

The witness corroborated previous testimony to the effect that the term, "flux," as it is used in connection with ceramic decorating, refers to a prepared low-melting glass, usually colorless, which may be mixed with pigments to produce vitrifiable coatings on glass or on clay ware, and that nepheline syenite is not a flux within that sense of the term, but is, rather, a refractory material. Included within the designation, "flux," as it is related to ceramic decorating, are smalts, frostings, ceramic colors, glazes, and enamels. A smalt is a low-temperature glass used for its cobalt content as an oxide coloring. A frosting is a material that is applied to the surface of glass or glaze to give a frosted appearance. Common ceramic fluxes include talc, barium carbonate, borax, fluorspar, cryolite, lithium, sodium carbonate, and calcium carbonate.

The pertinent provisions of paragraph 231, as originally enacted and as modified, read as follows:

"Smalts, frostings, and all ceramic and glass colors, fluxes, glazes, and enamels, all the foregoing, ground or pulverized, * * *."

Plaintiffs contend that classification as ceramic fluxes under the foregoing paragraph is predicated on the use of merchandise, and that such provision should prevail over the specific designation for sand, manufactured, in paragraph 1775, under which the present merchandise was classified. That "use" is an important consideration in the classification of merchandise under said paragraph 231, is supported by Drakenfeld & Co. v. United States, 9 Ct.Cust.Appls. 124, T.D. 37979, wherein the Court of Customs and Patent Appeals, referring to certain ceramic colors, stated that "Ceramic colors are those colors used in the ceramics or pottery arts." Urging application of the rule of "use" herein, plaintiffs point to testimony in the record, establishing that the chief use of the present merchandise is as a flux in the body of ceramic whiteware. It is important to observe, however, that such testimony refers, specifically, to nepheline syenite in 200-mesh form, which is a particular grade of nepheline syenite.

Nepheline syenite, as the record herein discloses, is a natural rock, identified as a crystalline rock. It is a mineral aggregate, composed of albite, anorthite, and nepheline. As a natural substance, it is processed for removal of impurities and ground or crushed into different mesh sizes or forms. The use of nepheline syenite is dependent on the mesh size or form of the natural mineral aggregate. The 20-mesh grade is used in the glass industry as an anticorrosion agent and also to strengthen glasses. The 200-mesh grade is chiefly used in the ceramic industry as a flux in the body of whiteware. Other grades, of finenesses greater than 200 mesh, are also used in the ceramic industry. There is nothing in the record before us to show the total production of nepheline syenite in all of its forms, and the comparable use, according to quantity, of the different sizes or grades. Hence, it cannot be stated as a positive finding that the chief use of the 200-mesh form, the merchandise in question, is, in fact, the chief use of all nepheline syenite.

In further consideration of the provisions of paragraph 231, supra, invoked herein by plaintiffs, it is urged by the party in interest that the nepheline syenite 200-mesh form involved herein is not within the class or kind of ceramic fluxes contemplated by paragraph 231. Counsel for the party in interest argue that smalts, frostings, colors, glazes, and enamels, which are enumerated in paragraph 231, are articles that are used for the sole purpose of decorating ceramic and glass products, and that "In this context the use of the general word 'fluxes' must be viewed as no more comprehensive in scope than the specific articles enumerated, under the well-established doctrine of *noscitur a sociis*."

The rule of *noscitur a sociis* was discussed in United States v. R. F. Downing & Co., 17 CCPA 194, T.D. 43645, as follows:

"The rule of *noscitur a sociis*, it is known by its associates, is a rule of construction to be applied where there is doubt and ambiguity concerning the meaning of a word or expression used by the legislative body in enacting a statute. It can not be invoked where there is no doubt as to the meaning of the word or term used. * * * An illuminating discussion of the rule of *noscitur a sociis* is found in Brown v. Chicago, etc., 102 Wis. 137, 77 N.W. 748, 78 N.W. 771, 44 L.R.A. 579, where Marshall, Judge, says:

" 'The maxim "Noscitur a sociis" is not a rule of interpretation by which the meaning of one word or designation, or that of several such, used in close connection, governs in determining the meaning of other words or designations used in the same connection. You may know a person by the company he keeps. You may know the meaning of a term by its associates—what precedes and what follows it. When? Not in every case; but when not apparent from the language itself. It is a rule of construction to be re-

sorted to where there is use for construction, not otherwise.' "

The need for the rule in determining the present issue stems from the evidence herein, coupled with the common meaning of the term "flux." The record before us shows that the term, "flux," has a broad meaning and includes any material which is added to a mix to promote fusion. In Funk & Wagnalls New Standard Dictionary, "flux" is defined as " * * * a substance, as borax or an alkali, that promotes the fusing of minerals or metals; * * *." Certain ceramic fluxes are used in the body of ware; others in decorating processes. Those used to promote fusion in the body of ceramics are not the same as those fluxes used in decorating ceramics. Recognition of the decorative phase of a flux appears in the definition of the word in the cited dictionary, stating that a flux is "any readily fusible glass or enamel used as a base or ground in ceramicwork."

All of the enumerated articles in paragraph 231—smalts, frostings, colors, glazes, and enamels—are used in the ceramic industry for decorating purposes. A smalt is a low-temperature glass used for its cobalt content as an oxide coloring in ceramic decoration. A frosting is a material, or a chemical, applied to the surface of glass or glaze to impart a frosted appearance to the ceramic object. Ceramic glazes and enamels are substances "designed to give a glassy coating to pottery," Richard & Co. v. United States, 3 Ct.Cust.Appls. 193, T.D. 32469. Ceramic colors are used for decorating purposes in "the ceramics or pottery arts," Drakenfeld & Co. case, supra. All of those articles are specially prepared products.

■ In order to reconcile the provision for ceramic fluxes in paragraph 231 with the articles specifically provided for therein, as hereinabove analyzed, the rule of *noscitur a sociis* must be applied. In doing so, we hold that the generic term, "fluxes," as it appears in association with the specific designations embodied in the provisions of paragraph 231, has application only to such ceramic fluxes that are used for decorating purposes.

To hold otherwise would result in an undesirable situation. *Eo nomine* provisions for common ceramic fluxes appear in different paragraphs of the Tariff Act of 1930; i. e., talc, paragraph 209; borax, paragraph 1633; lithium, paragraph 79; sodium carbonate, paragraph 81; litharge, paragraph 72; and cryolite, paragraph 1663. Plaintiffs' principal witness testified that cryolite is chiefly used as a ceramic flux. To apply the broad and comprehensive meaning to the provision for ceramic fluxes in paragraph 231, as urged by plaintiffs, would tend to make ineffective the *eo nomine* provisions just enumerated. It is axiomatic that such a condition is to be avoided.

Reference to earlier tariff acts that embodied statutory language substantially the same as the provision in controversy lends support to the limited construction of paragraph 231 set forth herein. The Tariff Act of 1909, 36 Stat. 11, contained the first enactment of language comparable to that under discussion. Paragraph 56 thereof provided for "all glazes, fluxes, enamels, and colors used only in the manufacture of ceramic, enameled, and glass articles." In paragraph 63 of the Tariff Act of 1913, 38 Stat. 114, substantially the same provision was enacted in the wording, "all ceramic and glass fluxes, glazes, enamels, and colors." In each of the cited paragraphs of the Tariff Acts of 1909 and 1913, provision was made for smalts and frostings in a general clause that provided for various paints and colors.

When legislation that ultimately became the Tariff Act of 1922, 42 Stat. 858, was under consideration, the Tariff Commission submitted a report that contained general information concerning paragraph 63 of the Tariff Act of 1913. Although the term "fluxes" was not defined, a description was given of colors, glazes, enamels, smalts, and frostings,

with the following comment (Tariff Information Surveys, A–15, 1922 (p. 188)):

"These products are used wholly in the ceramic industry in glazing, enameling, and decorating, and in the manufacture of ceramic decalcomanias, or mineral transfer designs for pottery use. * * *"

With such information before it, Congress enacted, in paragraph 231 of the Tariff Act of 1922, the provision for "Smalts, frostings, and all ceramic and glass colors, fluxes, glazes, and enamels, all the foregoing, ground or pulverized," which was identical with the language used in paragraph 231 of the Tariff Act of 1930 that is involved in this case.

The foregoing review of tariff legislation reflects a consistent congressional intent to associate within a single tariff clause or phrase, the class of articles or products used for decorating ceramic and glass products.

In the Cronin and Great Lakes Foundry Sand Co. cases, supra, which involved nepheline syenite, admittedly the same in all material respects as the present merchandise, the court held the substance to be properly classifiable as sand, manufactured, under paragraph 1775. In reaching its conclusion, the court stated, as set forth in the Cronin case, supra, that:

" * * * the term 'sand, manufactured' comprehends a material manufactured into sand from crystalline rocks, but excludes materials in the form of sand which have been produced from metalliferous ores or products manufactured and subsequently ground into a sand-like material. The rock from which the substance before us was manufactured is of crystalline character and contains large percentages of silica. * * *"

All of the proof adduced herein is directed toward plaintiffs' claim, alleging that this nepheline syenite 200-mesh form should be classified as a ceramic flux. Plaintiffs offered no evidence to show that the merchandise in question is not sand, manufactured, as classified by the collector. It is well established that "the classification by the collector and his official acts are presumptively correct," McKesson & Robbins, Inc. v. United States, 27 CCPA 157, C.A.D. 77, and that "the collector is presumed to have found every fact to exist that was necessary to sustain his classification," E. I. Du pont De Nemours & Co. v. United States, 27 CCPA 146, C.A.D. 75.

On the basis of the present record, and for all of the reasons hereinabove set forth, we hold the nepheline syenite 200-mesh form in question to be free of duty under paragraph 1775, supra, as sand, manufactured, as classified.

The conclusion gives effect to the "Note" appearing in paragraph 1775, as modified by T.D. 51802, stating as follows:

"The existing customs classification treatment of ground nepheline syenite as being provided for in 1775, Tariff Act of 1930, in accordance with the ruling announced in T.D. 51462(1), shall be continued during the effective period of this Agreement."

The Treasury Department ruling, 81 Treas. Dec. 95, T.D. 51462(1), referred to in the foregoing quotation, reads as follows:

"(1) Nepheline syenite, ground, is free of duty as sand, manufactured, under paragraph 1775, Tariff Act of 1930, following C.D. 685 and the principle of C.A.D. 202, rather than dutiable at the rate of 15 per centum ad valorem under paragraph 214, Tariff Act of 1930, as modified pursuant to the Canadian trade agreement. * * *"

The cases mentioned in the above-quoted ruling are the Great Lakes Foundry Sand Co. case, supra, and United States v. Canadian National Railways, 29 CCPA 272, C.A.D. 202, the latter case being authority for the proposition that the modification of a paragraph by trade agreement affects only articles already embraced within the scope of the para-

graph. The reference to ground nepheline syenite in paragraph 1775, as modified, supra, was not a reclassification of merchandise. Instead, it merely emphasized the long-continued practice of classifying nepheline syenite under the provision for sand, manufactured.

The introduction of an *eo nomine* designation in the modification of a paragraph by trade agreement is not without precedent. In paragraph 1558 which, as originally enacted, provided for all nonenumerated manufactured and unmanufactured articles, there was included for the first time, by modification under the exclusive trade agreement with Cuba, 83 Treas. Dec. 11, T.D. 51819, the specific provision for frog legs. There, as here, the *eo nomine* designation in the modified form of the paragraph followed court decisions construing the term. In At-

alanta Trading Corp. v. United States, 42 CCPA 90, C.A.D. 577, the United States Court of Customs and Patent Appeals stated that the *eo nomine* designation in said modified paragraph 1558 was not a reclassification of merchandise, but rather, an indication of legislative approval of judicial construction. The same can be said with respect to the specific mention of ground nepheline syenite in paragraph 1775, as modified, supra.

Consideration has been given to all of the cases cited in the briefs of counsel for plaintiffs and counsel for the party in interest. We have referred herein only to those cases that support the reasoning followed and the conclusion reached.

The protest is overruled and judgment will be rendered accordingly.