(C.D. 4803)

B. & K. Instruments, Inc.,
  PLAINTIFF,

                v.                    } Court Nos. R65/25188, etc.

United States,
  DEFENDANT.

(Decided May 22, 1979)

*Allerton deC. Tompkins* for the plaintiff.

*Barbara Allen Babcock*, Assistant Attorney General (*David M. Cohen*, Chief, Customs Section; *John J. Mahon*, trial attorney), for the defendant.

Ford, Judge: The articles involved in these five consolidated appeals for reappraisement consist of instruments and parts invoiced as models 2203 and 2204 sound level meters and model 1613 octave filter sets, which were appraised on the basis of foreign value [1] as defined in section 402a(c), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165. The basis of appraisement was predicated upon a finding by Customs that the articles

---

[1] Section 402a(c), as amended, provides;

(c) Foreign Value.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

came within the designation "Instruments and parts, laboratory, sound measuring," which appears on the final list of articles issued by the Secretary of the Treasury and published in 93 Treas. Dec. 14, T.D. 54521, covering articles to be appraised under section 402a, Tariff Act of 1930, as amended, *supra*. The appraised values were found to be the invoiced unit prices, net, packed, plus 29.03 percent. B. & K. Instruments, Inc., the plaintiff-importer of record, and the exporter, Bruel & Kjaer, were at the time of exportation related persons within the meaning of section 402(g) of the Tariff Act of 1930, as amended, *supra*.

The court has before it for determination the issue of whether the importations are laboratory instruments, or parts thereof, within the meaning of the final list. Plaintiff has conceded they are sound measuring instruments or parts thereof.

Plaintiff contends the importations are not on the final list inasmuch as they are not laboratory instruments and parts, and therefore the proper basis of appraisement is export value as defined in section 402(b),[2] Tariff Act of 1930, as amended, *supra*, which values are represented by the invoiced unit prices, net, packed, less the 29.03 percent addition.

At trial the parties stipulated if the court finds the merchandise is not on the final list, the proper basis of appraisement would be export value at invoice values.

The record consists of the testimony of five witnesses, two called on behalf of plaintiff and three on behalf of defendant. In addition, 11 exhibits were received on behalf of plaintiff and 8 on behalf of defendant, 1 of which was a collective exhibit (exhibits A–1 through A–4). Included before this court is the record in *The A. W. Fenton Co., Inc.* v. *United States*, 67 Cust. Ct. 519, R.D. 11755 (1971), *aff'd*, 70 Cust. Ct. 286, A.R.D. 313 (1973). By the incorporation of the record in the previously decided case, the court has before it for consideration all of the facts established in the earlier case. The merchandise involved in that case is described in the findings of fact of the trial court as follows:

> 1. That the merchandise involved herein consists of the following electronic instruments and parts manufactured by Bruel &

---

[2] Section 402(b), as amended, provides:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Kjaer, Copenhagen, Denmark, and exported from that country from 1959 through 1962: 3322, audio frequency response and spectrum recorder; 3311, 3313, audio frequency spectrum recorders; 2111, 2112, 2141, audio frequency spectrometers; 1611, 1612, 1/3 octave filter sets; 1619, extension filter set; ZS–0146, filter chassis; 2603, 2604, microphone amplifiers; 3330, narrow band spectrum recorder; 2107, frequency analyzer; 2612, 2613, 2615, cathode, followers; 4131, 4132, 4133, 4134, condenser microphone cartridges; 4408, two channel microphone selector; UA–0030, input adaptor; UA–0034, flush mounting; UA–0039, extension connector; UA–0040, probe microphone set; UA–0051, UA–0052, nose cones; 4122, floor stand; JJ–2612, input adaptor.

It also appears from the court's decision that the enumerated instruments and parts were appraised on the basis of foreign value, as defined in section 402a(c), Tariff Act of 1930, as amended, predicated, as in the case at bar, upon the Customs' finding that the articles came within the final list designation, "Instruments and parts, laboratory, sound measuring." The record therein established that certain of the analyses and recording instruments were chiefly used for nonlaboratory purposes and therefore were erroneously appraised. They were items 3322, 3311, 3313, 2111, 2112, 2141, 1611, 1612, 1619, ZS–0146, 2603, and 2604.[3] The court found export value, as defined in section 402(b), Tariff Act of 1930, as amended, *supra*, to be the proper basis for valuation of those items. The appellate term in affirming the judgment of the trial court adopted and incorporated by reference the findings of fact and conclusions of law of the lower court. (70 Cust. Ct. 286, 295, A.R.D. 313.)

Defendant argues there is a difference in merchandise and time of importation in the incorporated case and in the case now before the court. The court agrees with defendant's position that the incorporated case cannot be *stare decisis* of the issue.

In the case at bar defendant contends the imported merchandise belongs to a class of articles which is chiefly used as laboratory instruments for purposes of experiment or study and was properly appraised on the basis of foreign value as defined in section 402a(c), *supra*, by virtue of enumeration on the final list.

Although the classification of the imported merchandise is not in issue, determination of whether an article comes within the final list enumeration is dependent in large part upon the classification status under the Tariff Schedules of the United States and the rules of construction applicable thereto. In ascertaining whether an article comes within the final list description, this court and the appeals court

---

[3] Audio frequency response and spectrum recorder; audio frequency spectrum recorders; audio frequency spectrometers; 1/3 octave filter sets; extension filter set; filter chassis: microphone amplifiers.

have been guided by its tariff classification. *National Carloading Corporation* v. *United States*, 53 CCPA 57, C.A.D. 877 (1966).

Plaintiff contends that whether or not a particular imported article is specified on the final list is not based upon the use in the United States of competitive domestic articles of the same class or kind. The uses in the United States, plaintiff contends, of domestically produced sound level meters and octave filter sets are not pertinent to the question of whether articles imported from Denmark, having a high degree of accuracy, are chiefly used in this country for laboratory purposes related to experiment and study. Plaintiff further alleges the imported instruments are not laboratory instruments or parts thereof within the meaning of the final list if the particular imported articles are suitable for supplemental use in a laboratory, but are chiefly used throughout the United States at the time of importation for practical commercial applications as distinct from the purposes of laboratory testing for experiment and study. Plaintiff contends *inter alia* the evidence establishes these particular instruments were chiefly used throughout the United States during the period in issue for practical commercial applications rather than for laboratory testing for experiment and study. It is also alleged the written material furnished by defendant's witnesses indicate competitive domestic articles, claimed by defendant to be of the same class or kind, were chiefly used throughout the United States during the time period involved for practical commercial applications.

In support of its position plaintiff cites the following cases wherein the courts based their determination as to whether the items in controversy were, or were not, "laboratory instruments" upon the question of whether the particular articles were chiefly used in a laboratory without reference to other articles of the same class or kind: *United States* v. *Dyson Shipping Co.*, 27 CCPA 260, C.A.D. 96 (1940); *Davies Turner & Co.* v. *United States*, 40 Cust. Ct. 439, 441, Abs. 61536 (1958); *Federal Electric Products Co.* v. *United States*, 35 Cust. Ct. 47, C.D. 1720 (1955); *Davies Turner & Co. et al.* v. *United States*, 29 Cust. Ct. 248, C.D. 1477 (1952); *Brabender Corp. et al.* v. *United States*, 8 Cust. Ct. 267, C.D. 619 (1942); *Cambosco Scientific Co.* v. *United States*, 8 Cust. Ct. 191, C.D. 601 (1942); and *Arthur H. Thomas Co.* v. *United States*, 72 Treas. Dec. 203, T.D. 49102 (1937).

The opinion of the appellate term in the case of *The A. W. Fenton Co., Inc.* v. *United States*, 70 Cust. Ct. 286, 289, A.R.D. 313 (1973), *aff'g* 67 Cust. Ct. 519, R.D. 11755 (1951), is pertinent to the issues now before this court. The appellate term stated:

> In its opinion the trial court noted that, absent any published guide as to the meaning and scope of the final list term, "Instru-

ments and parts, laboratory, sound measuring", it would be appropriate to utilize, insofar as possible, the long settled rules applicable to the classification of "laboratory instruments". The court stated (67 Cust. Ct. 521–22):

> The term "laboratory instruments" has been construed as implying use for laboratory purposes. *R. J. Saunders & Co., Inc.* v. *United States*, 45 CCPA 87, C.A.D. 678 (1958); the Customs Court has indicated that "laboratory purposes" refers to use for experiment or study. *Westinghouse Electric Corporation* v. *United States*, 55 Cust. Ct. 271, C.D. 2589 (1965); *The A. W. Fenton Co., Inc.* v. *United States*, 49 Cust. Ct. 242, Abstract 67085 (1962). This court's construction of the term was noted without comment by the court of appeals without disturbing the same in *J. J. Boll, et al.* v. *United States*, 55 CCPA 86, 88, C.A.D. 937 (1968), and it appears to be a precedent of this court. The controlling consideration is therefore not the place where the merchandise was used but the purpose for which it was used. *Schick X-Ray Co., Inc.* v. *United States*, 62 Cust. Ct. 97, C.D. 3689, 295 F. Supp. 302 (1969).

> Furthermore, as the term in issue has been held to be a "use" provision, classification thereunder is predicated upon a finding that the merchandise was chiefly used for laboratory purposes. In challenging the finding, it is plaintiff's burden to establish the contrary by competent evidence. *Schick X-Ray Co., Inc.* v. *United States, supra; J. E. Bernard & Co., Inc.* v. *United States*, 44 Cust. Ct. 315, Abstract 63712 (1960).

> As the appraiser's finding of value is presumptively correct, 28 U.S.C. § 2633, plaintiff has assumed the burden of establishing either (1) that the analyses and recording instruments are not chiefly used for laboratory purposes, or (2) that all of the articles at bar are not sound measuring instruments within the meaning of the Final List.

The appellate term then stated at page 294:

> It is well settled that the actual use to which the importation is put is not controlling as to its chief use. *E. Dillingham, Inc.* v. *United States*, 54 CCPA 121, C.A.D. 922 (1967). Nor is testimony as to the use of the identical merchandise produced by the same importer sufficient: it is the use of the particular *class or type* of goods as a whole that is controlling. *Western Importing Company* v. *United States*, 62 Cust. Ct. 231, 297 F. Supp. 181, C.D. 3734 (1969); *Atkinson, Haserick & Co., Inc.* v. *United States*, 52 Cust. Ct. 215, C.D. 2463 (1964). In this aspect of the case the record is totally devoid of any testimony as to the uses of competitive articles of the same class or kind as that involved herein during the period in issue.

To sustain its burden of proof in the case at bar, plaintiff must establish that the imported articles are not laboratory instruments or

parts of laboratory instruments, i.e., those used for laboratory purposes. In *Applied Research Laboratories, Inc.* v. *United States*, 65 Cust. Ct. 505, 508, C.D. 4129 (1970), the court in reviewing the "laboratory purposes" stated:

> And this court has determined that "laboratory purposes" refer to use for experiment or study. *Thornley & Pitt, Misco, Inc.* v. *United States*, 58 Cust. Ct. 178, C.D. 2926, 266 F. Supp. 350 (1967); *The A. W. Fenton Co., Inc.* v. *United States*, 49 Cust. Ct. 242, Abstract 67085 (1962).

The defendant, in support of its position that chief use is determined on the basis of the chief use of a particular class or kind of article as a whole and not on the use of imported merchandise alone, cites among other authorities General Interpretative Rule 10(e)(i) of TSUS.[4]

Plaintiff's position is rule 10(e)(i) does not apply in the case at bar inasmuch as (1) the imported instruments were not classified under TSUS as laboratory instruments, and (2) that there is a congressional mandate that the aforesaid rule is to be used only for "the purposes of these schedules," and the question of whether or not the instruments in issue are to be used for laboratory purposes must, therefore, be predicated upon how the use or chief use provision of the final list was interpreted as of the time when the final list was enacted.

The court agrees that rule 10(e)(i) is not applicable to the case at bar. The test of chief use in effect prior to the tariff schedules is controlling. Chief use under the Tariff Act of 1930 was, however, basically the same as under TSUS. Such use was determined on the basis of the chief use of that class or kind of article at the time of importation throughout the United States, and not on the use of the imported merchandise. *E. Dillingham, Inc.* v. *United States*, 54 CCPA 121, C.A.D. 922 (1967); Sturm, *A Manual of Customs Law* (1974), p. 222. In order to prevail plaintiff must establish the chief use of the particular class of merchandise and that the importations themselves actually belong to that class. *Maher-App & Co., et al.* v. *United States*, 57 CCPA 31, C.A.D. 973, 418 F. 2d 922 (1969).

Mr. James W. Day, president and general manager of B. & K. Instruments, Inc., from 1958 to 1972, testified for plaintiff. He also executed an affidavit on August 15, 1975, which amplified his testi-

---

[4] General Interpretative Rule 10(e)(i) provides:

10. *General Interpretative Rules.*—For the purposes of these schedules—

* * * * * * *

(e) in the absence of special language or context which otherwise requires—
(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined.

mony at the trial. (Exhibit 4.) Mr. Day had been a witness in *The A. W. Fenton Co., Inc.* v. *United States, supra,* the record of which is incorporated herein. He was also a witness in *The A. W. Fenton Co., Inc.* v. *United States,* 49 Cust. Ct. 242, Abs. 67085 (1962). Mr. Day testified that his company imports and markets instruments which are manufactured by Bruel & Kjaer of Denmark, including the subject articles. He said that he had sold B. & K. instruments in all of the States in the United States, his company being the exclusive U.S. importer and purchaser of Bruel & Kjaer instruments.

The witness stated he was familiar with the imported models 2203, 2204, and 1613, and the nature, functions, operations, uses, and purposes for which they were designed and used. He testified he had used those three instruments extensively and had seen others use them in their places of business and in the field.

Model 2203 was described as a sound level meter consisting of a sensor microphone, which operates on a capacitance principle that converts the sound pressure to an electrical signal. The signal is then amplified so that a meter can indicate the level of the sound measurement on a calibrated scale. Mr. Day said he had used that instrument several thousand times and had seen others use it 300 or more times.

The witness testified that model 2203 was used for practical commercial applications of measuring sound as it pertains to the health and welfare of people and for the calibration of audiometers. Mr. Day said it was largely used for measurement of sound in the field to establish if certain machinery met a criteria that had been set by either the customers or the manufacturers.

Model 2204 was described as a sound level meter comprising a condenser microphone, a sensor to convert the sound pressure to an electrical signal, and the electronic amplifier to increase the amount of the electrical signal so that a meter can register the pressure impinging on the microphone. The witness characterized models 2203 and 2204 as miniaturized versions of the microphone amplifiers in the incorporated case, *The A. W. Fenton Co., Inc.* v. *United States,* 67 Cust. Ct. 519, R.D. 11755 (1971), *aff'd,* 70 Cust. Ct. 286, A.R.D. 313 (1973). It is noted in that case the microphone amplifiers were held chiefly to be used for nonlaboratory purposes.

Model 1613, an octave filter set or combination of filters in a single package designed solely to be attached to either model 2203 or 2204 sound level meter, was according to the witness a miniaturized version of the models 1611 and 1612 filter sets which were before the court in the incorporated case. In *The A. W. Fenton* case (R.D. 11755) plaintiff had established *prima facie* that models 1611 and 1612 were chiefly used by the Government and private companies in practical,

commercial applications such as quality control, preventive mainte-
nance, incoming inspection, and establishment of specifications for
commercial products and not in experiment or research. Defendant
therein offered no evidence, nor was there anything of record to refute
or contradict that aspect of testimony.

Mr. Day also testified that he had sold the instruments in issue to
industrial hygienists and safety engineers of industry, the military,
accoustical consultants, national, state, and city health departments,
insurance companies, sound system installations, speech, hearing
centers, otologists and otolaryngologists, and for quality control.

Gunnar Rasmussen, plaintiff's rebuttal witness who worked on
the B. & K. models 2203 and 2204 sound level meters and developed
a microphone used with those meters, said the three instruments were
specifically designed for falling outside the class of articles that he
recognized as laboratory instruments.

William C. Sperry,[5] who testified for defendant, said he had used
the B. & K. 2203 sound level meter and the 1613 octave filter sets in
General Electric's laboratory. For the most part they were used for
field measurements and experiments, the results of which were
analyzed at Mr. Sperry's direction. Material provided by the analysis
would invariably go into a report, which would discuss the problem
and its solutions and include recommendations. Mr. Sperry considered
that type of work to be research laboratory work. While working for
the Federal Aviation Administration, he had observed, on some occa-
sions, models 2203 and 1613 in programs of applied research and dem-
onstration, both in a fixed laboratory and in a field laboratory, and
had seen them used in measuring aircraft noise and in measuring
components of aircraft engine noise.

Defendant proffered the testimony of Anthony W. Paolillo, a
professional engineer in charge of the New York City Transit Au-
thority's Environmental Staff Division (formerly the Sound and
Vibration Analysis and Control Group). The witness testified his
group investigated problems of noise and vibration in the transit
system during the period in issue. Mr. Paolillo considered the B. & K.
2203 to be both a satisfactory field testing instrument and a satisfactory
laboratory instrument. He said he could have used the 2203 and the
1613 or the 2204 and the 1613 in a fixed area, which he described as
a laboratory in his operation.

From the foregoing evidence, it is concluded that the importations
either were or could be utilized for both laboratory and practical

---

[5] During the relevant time period Mr. Sperry said he had worked for the Illinois Institute of Technology,
Research Institute, a contract research laboratory involved in ultrasonic and psychoacoustics work but
mostly noise control; General Electric; and the Federal Aviation Administration.

commercial purposes. In the case at bar we are not concerned with use of the importations as such but with chief use of the particular class or type of goods. *E. Dillingham, Inc.* v. *United States, supra; The A. W. Fenton Co., Inc.* v. *United States, supra.*

In order to determine whether the importations herein belong to the particular class or kind of sound measuring and related instruments, a review of the factors found by the court to be pertinent must be considered. Such factors include the general physical characteristics of the merchandise, the expectation of the ultimate purchasers, the channels, class or kind of trade in which the merchandise moves, the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed), the use, if any, in the same manner as merchandise which defines the class, the economic practicality of so using the import, and the recognition in the trade of this use. Susceptability, capability, adequacy, or adaptability of the import to the common use of the class is not controlling. *United States* v. *The Carborundum Company,* 63 CCPA 98, C.A.D. 1172, 536 F. 2d 373 (1976), *cert. denie 1,* 429 U.S. 979 (1976); *Pistorino & Company, Inc.* v. *United States,* 81 Cust. Ct. 106, C.D. 4774 (1978).

Based upon the testimony of Dr. Peterson and Mr. Paolillo it has been established that during the relevant time period, instruments manufactured by American companies were used for the same purposes, were competitive with and met the same standards as the imported B. & K. sound level meters and octave filter sets.

According to Dr. Peterson, General Radio sound level meters and the octave-band analyzer were sold throughout the United States. The sound level meters were sold in competition with the B. & K. sound level meters. The octave-band analyzer was sold in combination with B. & K.'s sound level meters and octave filter sets. The witness considered his company's sound level meters (1551C, 1565A, and 1561) to be of the same class or kind of instrument as the B. & K. sound level meters. All met the same relevant U.S. standards. Dr. Peterson considered the combination of the General Radio 1558 octave-band noise analyzer and its 1551C sound level meter to be the same class or kind of instruments and performing the same function as the combination of the B. & K. 2203 and 1613. He stated that Hewlett-Packard, Columbia Research, and H. H. Scott produced sound level meters and were competing for the same customers.

Mr. Paolillo testified that prior to purchasing equipment to investigate noise and vibration in the transit system, his group gave consideration to instruments manufactured by General Radio, B. & K., and H. H. Scott. The General Radio model 1551C sound level meter

was among the instruments purchased. The witness stated the 1551C and B. & K. 2203 were alternative choices. The price was very close, the instruments were equally suitable, and both met the American standards and performed the same function. The group additionally acquired another model of General Radio sound level meter and a B. & K. package, which included a 2204 sound level meter, as well as a 1613 octave filter set. Mr. Paolillo said all met the standards applicable during the related period.

Mr. Rasmussen testified he was personally familiar with all of the sound meters produced by General Radio Co., Columbia Research Co., and H. H. Scott Co., as he was required to know the competitive market situation. He had seen them at exhibitions, trade shows and technical seminars in the United States. In the witness' opinion the General Radio 1551C sound level meters were of the same capabilities as the 2203, 2204, and 1613. There were differences in that the B. & K. instruments and those of General Radio did not have the same reproducibility. The witness did not regard General Radio's 1551C sound level meter to be as satisfactory as the 2203, 2204, and 1613. The B. & K. models were not suitable for indoor mountings, as they were hand-held and more suitable for practical field use. Mr. Rasmussen conceded that conditions could exist where the B. & K. 2203 and General Radio 1551C would come very close to each other. He said the 1551C, as well as the 2203 and 2204, met the applicable standard for the sound level meters in effect during the related time period. The witness testified that the B. & K. 2603 was comparable to the General Radio 1561 instrument but the B. & K. 2203, 2204, and 1613 were more suitable for practical field uses as they were hand-held.

There are no samples of the importations before the court. Nor are there samples of domestic instruments. In evidence, however, are advertisements which illustrate and describe the instruments. They are supportive of testimony proffered by Dr. Peterson and Mr. Paolillo on the issue of class or kind. B. & K. models 2203, 2204, and 1613 are shown to be hand-held, compact, lightweight, and battery operated.[6] General Radio's catalog S (exhibit F–1) describes its 1551C sound level meter as compact and portable, weighing less than 8 pounds with battery; the 1565A sound level meter as pocket sized and lightweight (1¾ pounds), powered by a single 1.5 volt C cell; and the 1558 octave-band noise analyzer as small, compact, and portable, weighing less than 9 pounds and battery operated.

---

[6] Exhibit A–1 illustrates B. & K. model 2203 sound level meter with model 1613 octave filter set as hand-held and describes it as compact, lightweight, and battery operated. Exhibit A–3 illustrates B. & K. model 2204 sound level meter as hand-held and describes it as being "in a portable, battery-operated, hand-held package."

The record establishes the imported sound level meters and the octave filter sets, which were designed solely for use with the meters, were used to measure sound, for calibration, and for research and accumulation of data to establish noise standards. The domestic General Radio sound level meters and analyzer were used basically to measure and analyze sound. The ultimate purchasers of both the imported and domestic instruments were industry, government, the military, educational and research institutions, and acoustical consultants. Testimony had been elicited that Hewlett-Packard, Columbia Research, and H. H. Scott produced sound level meters and were competing for the same customers.

It is clear from the evidence of record that the importations and the domestic instruments were used to measure sound. In some instances the results of such measurement were utilized for commercial purposes. In others, information obtained in the field was essential for laboratory purposes, i.e., for experiment and study. The two kinds of merchandise were sold to the same class of purchasers.

In *The Golding-Keene Company et al.* v. *United States (E. Dillingham, Inc., a/c Rheem Mfg. Co., Party in Interest)*, 44 Cust. Ct. 169, C.D. 2172, 183 F. Supp. 947 (1960), *aff'd*, 48 CCPA 66, C.A.D. 766 (1961), the trial court held the phrase as found in section 516(b), Tariff Act of 1930, as amended, did not require the imported merchandise to be identical with the product of the domestic producers. The record therein included evidence to the effect that the two kinds of merchandise were sold to the same class of purchasers and were used for the same purpose.

In the case at bar it is clear from the testimony and the exhibits that the importations while not identical to the domestic instruments are basically used for the same purposes and are sold to the same class of purchasers. The court, therefore, concludes that the importations are of the same class or kind as the domestic sound measuring instruments.

The basis of appraisement herein was predicated upon a finding that the merchandise was chiefly used for laboratory purposes within the purview of the final list desi;nation. As the Customs officials' finding of value is presumptively correct (28 U.S.C. § 2635(a)), plaintiff has the burden of establishing that instruments of the same class or kind are not chiefly used for laboratory purposes. Chief use must be predicated upon evidence which is representative of an adequate cross section of the country, *L. Tobert Co., Inc., et al.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953), with respect to use by users, as a whole, of the particular type of commodity involved and not upon the actual individual use of a particular shipment in issue, *United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835 (1930).

The record establishes that merchandise of the class or kind to which the imported merchandise belongs is used for both laboratory (research and study) and nonlaboratory (commercial) purposes. Accordingly, plaintiff has failed to overcome the presumption of correctness attaching to the appraisement.

In view of the foregoing and on the record before it, the court makes the following findings of fact and conclusions of law:

*Findings of fact*

1. That the merchandise of the reappraisement appeals herein consists of sound level meters, models 2203 and 2204, and model 1613 octave filter sets, exported from Denmark by Bruel & Kjaer and entered at the port of Cleveland, Ohio.

2. That B. & K. Instruments, Inc., the plaintiff-importer of record, and Bruel & Kjaer, the exporter, were at the time of exportation related persons within the meaning of section 402(g) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. That the importations are conceded to be sound measuring instruments or parts thereof.

4. That the involved merchandise was found to be on the final list issued by the Secretary of the Treasury, T.D. 54521, under the provision for "Instruments and parts, laboratory, sound measuring."

5. That the articles were appraised on the basis of foreign value, as defined in section 402a(c), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at the invoiced unit prices, net, packed, plus 29.03 percent.

6. That plaintiff has failed to establish that the imported items of merchandise are of a class or kind which are not chiefly used for laboratory purposes and, hence, not within the final list designation.

*Conclusions of law*

1. That foreign value, as that value is defined in section 402a(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for appraisement of the merchandise here involved.

2. That the presumption of correctness attaching to the customs officials' valuations of the merchandise in question has not been overcome.

3. That the foreign value for the merchandise herein is represented by the appraised values.

Judgment will be entered accordingly.