(C.D. 3905)

INTERNATIONAL CUSTOMS SERVICE, INC.
VLIER ENGINEERING CORP.
} *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 23, 1969)

*Glad & Tuttle* (*Robert Glenn White* of counsel) for the plaintiffs.
*William D. Ruckelshaus*, Assistant Attorney General (*Brian S. Goldstein* and *Robert Blanc*, trial attorneys), for the defendant.

Before RAO, FORD, and NEWMAN, Judges

RAO, Chief Judge: The merchandise involved in this case consists of molded rubber die springs, imported from West Germany and entered at the port of Los Angeles. It was assessed with duty at 19 per centum ad valorem under item 680.90 of the Tariff Schedules of the United States, as amended by the Automotive Products Trade Act of 1965, Public Law 89–283, 100 Treas. Dec. 845, T.D. 56540, as machinery parts, not containing electrical features and not specially

provided for. It was originally claimed that the merchandise was properly dutiable at 11½ per centum ad valorem under item 678.35, as parts of molding machines, but this claim has not been pressed and is deemed abandoned. By amendment to the protest it is claimed that the merchandise is dutiable at 14 per centum ad valorem under item 674.53, as parts of machine tools, other than metal-working machine tools for cutting or hobbing gears.

The pertinent provisions of the tariff schedules are as follows:

Subpart J, Part 4, Schedule 6, Tariff Schedules of the United States, as amended:

| | | |
|---|---|---|
| 680.90 | Machinery parts not containing electrical features and not specially provided for_ | 19% ad val. |

Subpart F, Part 4, Schedule 6, Tariff Schedules of the United States:
Subpart F headnotes:
1. For the purposes of this subpart—
    (a) the term "machine tool" means any machine used for shaping or surface working—
        (i) metals * * * .
        (ii) stone, ceramics, concrete * * * and like mineral materials, or glass in the cold; or
        (iii) wood, cork, bone, hard rubber or plastics, or other hard materials,
    whether by cutting away or otherwise removing the material or by changing its shape or form without removing any of it, but does not include rolling mills (* * *) or the hand-directed or controlled tools * * *

* * * * * * *

Work and tools holders and other parts of, * * * machine tools; * * *:

| | | |
|---|---|---|
| 674.50 | Tool holders_____ | 15% ad val. |
| | Other: | |
| | Parts: | |
| 674.51 | Cast-iron (* * *)_____ | 3% ad val. |
| | Other: | |
| 674.52 | Parts of metal-working machine tools for cutting or hobbing gears_ | 20% ad val. |
| 674.53 | Other parts_____ | 14% ad val. |

At the trial plaintiffs called Duane R. Marion, chief engineer of Vlier Engineering Corp., an importer and manufacturer of parts for

machine tools. He testified that he had attended Texas A. & M. College for 3 years but was not a graduate engineer. However, he has worked in the engineering field for 10 years; as a tool designer with Convair Aircraft Corporation; as a manufacturing engineer with Chance-Vought, and as an engineer with Vlier Engineering. In his last position he has been responsible for designing and developing new products, checking out products to be added to the firm's line, and communicating with distributors and with customers who had technical problems and needed answers concerning the firm's products. Vlier's business is nationwide, with headquarters in Los Angeles, and Mr. Marion's responsibilities are not restricted to any particular area of the country.

The witness testified that the merchandise described on the invoices consisted of molded rubber die springs, represented, except as to size, by exhibits 2, 3, and 4. Such merchandise was first imported by Vlier in November of 1966.

According to the witness, molded rubber die springs are springs that are used to take a compressive load in machine tools that form, punch, shape, or cut material. They are sold to the machine tool industry and are intended to replace steel die springs used for the same purpose. They are not tool holders and are not used on machines which cut or hob gears. While the witness had never seen them in actual, commercial use, he had participated in demonstrating them. He said they might possibly be used for some other purpose but that would not be what they were designed for and he had never heard of it being done. He pointed out that they were round in shape because they deform when compressed and the round shape was important in obtaining a certain pressure at a certain differential. He supposed it was not impossible to use them in automobiles but he was not familiar enough with the requirements of automobile springs to state whether that was practical.

The witness said it was necessary for him to be aware of similar products on the market; therefore, he knew that there were no other importers of the articles in issue nor were there any domestic manufacturers of products identical to exhibits 2, 3, or 4.

Plaintiffs' second witness was Vance Murrow, regional sales manager of Vlier Engineering Corp. He has been with Vlier since March 1966 and had previously been manager of Bay City Tool & Die Company, a distributor of machine tools, parts and supplies in northern California. He had bought and sold die springs for the past 15 years. He presently works with distributor salesmen and calls on individual users to promote and sell Vlier's products. He had sold merchandise such as exhibits 2, 3, and 4 since Vlier had them in its catalogue. He travels throughout his territory, which includes California and Ari-

zona and more recently the 11 Western States, to sell Vlier's products, and goes to trade shows in Chicago and Philadelphia to demonstrate them. He is required to be familiar with the uses of the goods he sells and had seen the merchandise represented by exhibits 2, 3, and 4 used in different plants and had demonstrated their use. They are used to replace steel die springs, that is, springs that are used in machine tools to return a part to its original position. He had seen machines which utilize such articles in various plants throughout the United States and had sold merchandise for them. These machines stamp, form, draw, pierce, or cut metal or hard materials in some manner, shape, or form, and, in his opinion are machine tools, as defined in headnote 1, subpart 4F, schedule 6, *supra*. He explained that the machines could not function without the use of die springs, stating:

> Whenever you have a reciprocating action, you have to have something to strip the part, or remove the part, from the die itself. When you are stamping a part, you want one of two things. You either want the hole stamped out—you want to save that—or you want to save the outter [sic] part. To save that part, you have to have a way to eject it out. Springs are the only method that I know of for doing this.

By reciprocating action he meant one particular part of an article of a machine going one way, and having to go back to its original position. He said that rubber die springs are used only on machines that have a reciprocal action and cannot be used on machines that cut or hob gears.

The witness testified that when he sells the instant merchandise, he sells it as a replacement for steel die springs, stressing the advantages of the rubber spring over the steel spring. He knew of only one use not on a machine tool, which was in connection with inserting a fuse into a bomb. He said this was a temporary use and that the customer bought only four rubber die springs. To his knowledge his firm has not developed any other use for the merchandise up to the present. He said it could not possibly be used in an automobile engine because the pistons create heat and the rubber die spring could not take it. Nor could it be used in a valve lifter in an automobile because such a spring has to have a very, very short stroke and a very long life expectancy.

The witness also stated that there are other general purpose rubber springs but that they are not the same as rubber die springs, are not competitive with them, and do not replace steel die springs.

The issue before the court is whether these rubber die springs are classifiable as machinery parts, not specially provided for, under item 680.90, or as parts of machine tools other than machine tools for cutting or hobbing gears, under item 674.53.

Since the superior heading to item 674.53 is more specific than the

provisions of item 680.90, it is clear that if these articles are, parts of machine tools, they are classifiable under the former.

According to the record presented, these rubber die springs are designed and used in machines which stamp, form, punch, shape, pierce, or cut metal or hard material and have a reciprocating action. It is not disputed that such machines fall within the definition of machine tools in headnote 1, subpart 4F, schedule 6, *supra*. It also appears from the record that such machine tools could not operate without die springs. Defendant claims, however, that it has not been shown that the rubber die springs involved herein are solely or chiefly used in such machine tools.

In order to be classified as a part of an article under the Tariff Schedules of the United States, the product must be solely or chiefly used as a part of such article. General Interpretative Rule 10(ij). To sustain its claim in the instant case, plaintiffs must establish that the merchandise is chiefly used as parts of machine tools, rather than as parts of machinery, as classified.

It is well settled that chief use in a question of actual fact which must be determined on the basis of testimony representative of an adequate geographical cross section of the country. *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953). Where it appears from the evidence and the character of the merchandise that the articles would be used in substantially the same manner and by substantially the same class of people in one section of the country as in another, evidence of chief use in a large or otherwise representative area of the country is sufficient. *United States* v. *F.W. Woolworth Co.*, 23 CCPA 98, T.D. 47765 (1935) ; *A.N. Deringer, Inc.* v. *United States*, 48 Cust. Ct. 138, C.D. 2326 (1962) ; *Instrumentation Associates* v. *United States*, 51 Cust. Ct. 136, C.D. 2421 (1963).

The unimpeached and uncontradicted testimony of a single competent and credible witness may be sufficient to overcome the presumption attaching to the collector's classification and establish a *prima facie* case. *United States* v. *Gardel Industries*, 33 CCPA 118, C.A.D. 325 (1946). Executives concerned with designing, framing specifications, ordering, importing, selling, distributing, and promoting an article have to know its chief uses and may properly give testimony as to such uses. *F.B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617 (1966) ; *Davis Products, Inc. et al.* v. *United States*, 59 Cust. Ct. 226, C.D. 3127 (1967) ; *Inter Maritime Fwdg. Co., Inc.* v. *United States*, 59 Cust. Ct. 412, C.D. 3177 (1967), appeal dismissed 55 CCPA 115 (1968). Furthermore, importers of merchandise have every incentive for knowing the uses to which their goods are or may be put and it may be assumed, *prima facie*, that the only uses known to

them are the only uses of such wares. *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T.D. 31120 (1910) ; *Kubie & Co.* v. *United States*, 12 Ct. Cust. Appls. 468, T.D. 40668 (1925) ; *United States* v. *The Baltimore & Ohio R.R. Co., a/c United China & Glass Company*, 47 CCPA 1, C.A.D. 719 (1959).

The witnesses in this case were well qualified to give their opinion as to the use of the imported rubber die springs. One was an engineer concerned with designing products and communicating with distributors and customers on technical questions. He was familiar with the articles, had demonstrated their use, and knew what they were designed for. His responsibilities were nationwide. The other witness had bought and sold die springs for 15 years and had sold rubber die springs since Vlier had first imported them. While his sales territory was limited to the 11 Western States, he attended trade shows in other areas and had seen machine tools which utilize die springs in various plants throughout the United States. He testified that machine tools do not differ from one part of the country to another. It does not appear that rubber die springs, which replace steel die springs, are a type of merchandise which would have different uses in different areas. According to the record, the merchandise was designed for use in machine tools having a reciprocating action, and, except for one temporary application, the only actual use known to the witnesses was in such machine tools. Since the merchandise was not imported by anyone other than Vlier and there were no domestic producers of identical merchandise, they were in a position to know. The merchandise is a new product which entered the commerce of the United States in 1966 and the importer has been seeking to increase its market and the use of the product. However, at the time of trial, it had not developed any other uses although it was to its advantage to do so. Other possible uses were suggested in the course of the trial, but whether they would ever materialize is purely speculative.

In our view, the record establishes *prima facie* that at the time of importation, these rubber die springs were chiefly used as parts of machine tools other than metal-working machine tools for cutting or hobbing gears.

We hold, therefore, that the merchandise is properly dutiable at 14 per centum ad valorem under item 674.53, Tariff Schedules of the United States, as parts of machine tools other than metal-working machine tools for cutting or hobbing gears. To that extent the protest is sustained. As to all other claims, the protest is deemed abandoned and is dismissed. Judgment will be entered accordingly.