(R.D. 11755)

THE A. W. FENTON CO., INC. *v.* UNITED STATES

Entry Nos. WH 169, etc.

(Decided December 16, 1971)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff.
*L. Patrick Gray, III*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

LANDIS, Judge: The articles involved in the 34 consolidated appeals for reappraisement herein consist of electronic measuring instruments and parts manufactured by Bruel & Kjaer of Copenhagen, Denmark, exported from that country from 1959 through 1962, and appraised

on the basis of foreign value [1] as defined in section 402a(c), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165. The appraisements were predicated upon a finding by the appraiser at the port of Cleveland that the articles came within the designation, "Instruments and parts, laboratory, sound measuring", which appears on the Final List of articles, issued by the Secretary of the Treasury and published in T.D. 54521, covering articles required to be appraised under section 402a, Tariff Act of 1930, as amended, *supra.*

Plaintiff contends that the imported items are not on the Final List; that the proper basis of appraisement is export value as defined in section 402(b),[2] Tariff Act of 1930, as amended, *supra;* and that the export values are represented by the invoice unit prices, net, packed, less a proportionate part of certain nondutiable items marked "X" in red ink on the invoices under appeal.

It was stipulated that, if the court finds that some, or all, of the articles herein are not described on the Final List, there is an export value, as defined in section 402(b), as amended, and that, at the time of exportation, said items were freely sold in the principal market of Denmark, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States at the unit prices set forth on the invoices, net, packed, less a proportionate part of the items marked "X" in red ink on the invoices.

The record consists of the testimony of James W. Day, president and general manager since 1958 of B & K Instruments, Inc., for whose account the merchandise was imported; a schedule of the items involved herein (exhibit 1); portions of the B & K Instruments, Inc. 1967 catalogue which illustrate and describe the articles in issue (exhibits 2-A through 2-R); and a listing of companies and agencies using some of the articles herein during the period 1959 though 1962 and specifying their manner of use (exhibit 3).[3]

---

[1] Section 402a(c), as amended, provides:

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

[2] Section 402(b), as amended, provides:

(b) EXPORT VALUE.—For the purpose of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

[3] A motion to incorporate the record in *The A. W. Fenton Co., Inc.* v. *United States,* 49 Cust. Ct. 242, Abstract 67085 (1962), which involved the classification of articles not in issue herein, is hereby denied.

The witness gave testimony regarding specific uses, assertedly in "practical commercial applications", of the foregoing articles during the period from 1959 through 1962. In reliance thereon, plaintiff claims that the items involved in this case, whether or not sound measuring, are not "laboratory instruments" within the meaning of the tariff statutes,[4] and, therefore, not on the Final List.

The gist of plaintiff's position, as developed in this long and complex record, is that certain of the imported articles, which comprise a "family" of instruments dealing with frequency analyses and recording of the analyses information, do not measure sound; that the remaining articles concededly are sound measuring instruments, or parts thereof; but in any event that none of the importations herein is a "laboratory instrument" within the meaning of the tariff statutes.

Although the classification of the imported merchandise is not in issue, both parties appear to take the position that determination of whether an article comes within the Final List enumeration is dependent in large part upon its classification status under the tariff schedules and the rules of construction applicable thereto. There is precedent for this position; in ascertaining whether an article came within the Final List description, the trial court and the court of appeals have been guided by its tariff classification. *National Carloading Corporation* v. *United States*, 53 CCPA 57, C.A.D. 877 (1966) ; *U.S. Divers Co.* and *Wiley* v. *United States*, 64 Cust. Ct. 721, R.D. 11707 (1970).

In the absence of any publication of record by the Secretary of the Treasury, to whom authority was delegated to formulate the Final List, which would provide a guide as to the meaning and scope of the term "Instruments and parts, laboratory, sound measuring", I think that it is appropriate to apply, insofar as possible, the long settled rules applicable to the classification of "laboratory instruments". See *National Carloading Corp.* v. *United States*, *supra.*

The term "laboratory instruments" has been construed as implying use for laboratory purposes. *R. J. Saunders & Co., Inc.* v. *United States*, 45 CCPA 87, C.A.D. 678 (1958) ; the Customs Court has indicated that "laboratory purposes" refers to use for experiment or study. *Westinghouse Electric Corporation* v. *United States*, 55 Cust. Ct. 271, C.D. 2589 (1965) ; *The A. W. Fenton Co., Inc.* v. *United States*, 49 Cust. Ct. 242, Abstract 67085 (1962). This court's construction of the term was noted without comment by the court of appeals without disturbing the same in *J. J. Boll, et al.* v. *United States*, 55 CCPA 86, 88, C.A.D. 937 (1968), and it appears to be a precedent of

---

[4] There is no specific provision in the tariff statute (for classification purposes) of "sound measuring laboratory instruments." Paragraph 360, Tariff Act of 1930, in effect during the period of importation, provides for "Scientific and laboratory instruments, apparatus, utensils, appliances (including surveying and mathematical instruments), and parts thereof, * * *."

this court. The controlling consideration is therefore not the place where the merchandise was used but the purpose for which it was used. *Schick X-Ray Co., Inc.* v. *United States*, 62 Cust. Ct. 97, C.D. 3689, 295 F. Supp. 302 (1969).

Furthermore, as the term in issue has been held to be a "use" provision, classification thereunder is predicated upon a finding that the merchandise was chiefly used for laboratory purposes. In challenging the finding, it is plaintiff's burden to establish the contrary by competent evidence. *Schick X-Ray Co., Inc.* v. *United States, supra; J. E. Bernard & Co., Inc.*, v. *United States*, 44 Cust. Ct. 315, Abstract 63712 (1960).

As the appraiser's finding of value is presumptively correct, 28 U.S.C. § 2633, plaintiff has assumed the burden of establishing either (1) that the analyses and recording instruments are not chiefly used for laboratory purposes, or (2) that all of the articles at bar are not sound measuring instruments within the meaning of the Final List.

Proceeding to a consideration of (1), chief use is a question of actual fact which must be established on the basis of positive testimony representative of an adequate geographical cross section of the country, *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953), with respect to the use by users as a whole of the particular type of commodity involved at or immediately prior to the time of importation, *United States* v. *Gardel Industries*, 33 CCPA 118, C.A.D. 325 (1946), and not upon the actual use of the shipment in issue. *United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835 (1930).

The unimpeached testimony of a single competent witness may be sufficient to overcome the classifying officer's finding and establish a *prima facie* case, in establishing or negativing chief use, *United States* v. *Gardel Industries, supra; International Customs Service, Inc., Vlier Engineering Corp.* v. *United States*, 63 Cust. Ct. 255, C.D. 3905 (1969), especially when the witness is an importer or distributor of the article in issue. *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T.D. 31120 (1910); *Schick X-Ray Co., Inc.* v. *United States, supra; Gallagher & Ascher Company* v. *United States*, 39 Cust. Ct. 1, C.D. 1892 (1957). Executives concerned with designing, framing specifications, ordering, importing, selling, distributing, and promoting an article have to know its chief uses and may properly give testimony as to such uses. *International Customs Service, Inc., Vlier Engineering Corp.* v. *United States, supra; Inter Maritime Fwdg. Co., Inc.* v. *United States*, 59 Cust. Ct. 412, C.D. 3177 (1967), appeal dismissed 55 CCPA 115 (1968); *Davis Products, Inc., et al.* v. *United States*, 59 Cust. Ct. 226, C.D. 3127 (1967); *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 Cust. Ct. 103, C.D. 2617 (1966).

In the case before us, the witness Day testified that, in working with his customers, visiting plants, and taking a demonstration van containing the instruments herein throughout the country during 1959–1962, he had seen the subject articles in operation in many plants throughout the country. They were chiefly used in quality control, that is, inspection of manufactured items; in establishing specifications for a product being designed, "design goal"; and in preventive maintenance of operating equipment. At the most, he stated, three to five percent of the equipment was used in universities and in research and experimental work developing new processes or new materials.

The witness testified as follows as to his recollection of the various uses made of the analyses instruments, items 3322, 3311, 3313, 2111, 2112, 2141, 1611, 1612, 1619, ZS–0146, 2603, 2604, 2107 and 3330, during the 1959–1962 period, and submitted a list (exhibit 3) indicating where and how these articles were used.

Item 3322, an audio frequency response and spectrum recorder, of which there were "more than 10" in operation during 1959 through 1962, was observed in use in six companies, located variously in Maryland, Ohio, California, Indiana, and Michigan, checking the vibration of submarine turbines and drive systems as part of a preventive maintenance program; testing vibration of electric motors supplied to the Navy; measuring the effects of vibration on aircraft and missiles; testing turbine blade resonance; and testing the amount of vibration transmission from a test road to the driver of a vehicle.

Items 3311 and 3313, audio frequency spectrum recorders, of which more than 25 were in operation during 1959–1962, were used, as the witness recalled, in the Brooklyn Navy Shipyard, which had "quite a complement", to check vibration of ship and submarine machinery; in the Aberdeen Proving Grounds, Maryland, to test vibrations from a test road to the driver of a vehicle; and in at least ten companies,[5] in Maryland, New York, California, Colorado, Maine, Connecticut, and Pennsylvania, to test turbine vibration to determine if overhaul was needed; to control the quality of gear cutting equipment; to test aircraft and missile vibration and pulsation in submarine pumps to determine if they met required specifications; to control the quality of photographic film and paper; to test the self generated signal of precious metal wiping contacts; and for incoming inspection of ship and submarine equipment to determine if they met vibration limits.

With respect to items 2111, 2112, and 2141, audio frequency spectrometers, about 25 of the 100 to 150 in operation during 1959–1962 were observed in use in association with other analyses instruments (not in issue herein) in Ohio, Michigan, Kentucky, California, Connecticut, New York, Pennsylvania, Texas, Florida, New Jersey, Maryland, and

---

[5] Some companies had more than one of these machines.

Arizona in quality control and preventive maintenance applications, and in product testing.

As to items 1611, 1612, 1619 and ZS–0146, filter sets and extension filter sets, the witness had observed 8 of the 30 in operation during 1959–1962 used in combination with other measuring instruments in quality control and inspection of equipment; and as to items 2603 and 2604, microphone amplifiers, he had observed 5 out of 50 in use during that period, in Washington, California, Arizona, and Illinois, to measure vibration, as part of a measurement of a transistor-diode self-generated signal, and as an amplifier.

On the record herein, I find that plaintiff has established *prima facie* that the following analyses instruments, items 3322, 3311, 3313, 2111, 2112, 2141, 1611, 1612, 1619, ZS–0146, 2603, and 2604, are chiefly used by the government and private companies in practical, commercial applications such as quality control, preventive maintenance, incoming inspection, and establishment of specifications for commercial products, and not in experiment or research. Although the witness had not personally observed a majority of all of the foregoing items in use, nonetheless, his wide ranging experience based on his sales, visits to plants, work on engineering problems with customers utilizing these instruments, and the need to be familiar with the requirements of his present and prospective customers renders his testimony in this area credible and gives it great probative value. I also note that defendant has offered no evidence, and there is nothing of record, to refute or contradict this aspect of Day's testimony.

Accordingly, I find that the foregoing articles are not chiefly used for laboratory purposes and, therefore, are not laboratory instruments within the purview of the Final List designation, "Instruments and parts, laboratory, sound measuring", as contended by plaintiff. In light of this finding it is unnecessary to consider whether said articles measure sound.

This leaves before me for consideration two analyses instruments which plaintiff contends are neither sound measuring nor chiefly used for laboratory purposes and on the other hand various articles which plaintiff concedes are sound measuring instruments but claims are other than laboratory instruments.

As to the two items contended not to be sound measuring, items 2107, a frequency analyzer, and 3330, a narrow band spectrum recorder, which incorporates the 2107, the record compels a different finding. The evidence fails to show either that they were not laboratory instruments or that they were not sound measuring.

Item 2107 is "Designed for analyses and linear measurements in mechanical, acoustical and electronic *research* and production control" (exhibit 2–I, page 37, emphasis supplied), and concededly is used for

analyses and linear measurement in mechanical, acoustical and electronic research in addition to other uses. The witness has seen only about 25 units of the 2107 in operation, all allegedly in commercial applications, either individually or as part of another article, from 1959 through 1962, although about 100 to 150 were in operation during that period. And he could recall only one use, also commercial, of the 3330, but did not indicate how many units of that model were being used during that time.

The evidence points to the fact that the 2107, albeit having other uses, was also designed *and used* in research, thus supporting defendant's position that that unit and the 3330 were used for laboratory purposes. On the question of chief use, the witness was unable to indicate how many of the total number of the 2107 and 3330 units in operation during the 1959–1962 period were employed in experiment and study and how many were used in other non-laboratory applications. The record is too meagre and uncertain on this point to warrant disturbing the appraiser's presumptively correct finding that these articles are laboratory instruments.

With respect to the category of articles conceded to be parts of sound measuring apparatus but claimed to be other than labortaory instruments, viz., items 4408, 2612, 2613, 2615, JJ–2612, 4131, 4132, 4133, 4134, and the "UA" series items 0030, 0034, 0039, 0040, 0051, 0052 and 4122, the witness Day testified that he had encountered "hundreds of instances in which these units were used for practical commercial applications." However, this conclusory statement does not constitute substantial evidence which would justify setting aside the appraiser's findings herein, *United States* v. *Fisher Scientific Co.*, 44 CCPA 122, C.A.D. 648 (1957). Although some details regarding his observations of the various articles were furnished by the witness, they are too meagre to substantiate plaintiff's claim as to chief use.[6]

As there is nothing of record herein to indicate that items 4408, 2612, 2613, 2615, JJ–2612, 4131, 4132, 4133, 4134, UA–0030, UA–0034, UA–0039, UA–0040, UA–0051, UA–0052, and UA–4122 (conceded to be parts of sound measuring instruments), lend themselves more readily to non-laboratory than to laboratory use, I find that plaintiff has not met its statutory burden of establishing error in the appraiser's finding that the articles are chiefly used for laboratory purposes and are properly on the Final List. Accordingly, the presumption of correctness

---

[6] The witness could testify only as to ten of the approximately 200 cathode followers, items 2612, 2613, and 2615, and input adaptors, item JJ–2612, in use; 15 out of 250 condenser microphone cartridges, items 4131, 4132, 4133, and 4134; five out of the approximately 50 nose cones, UA–0051 and UA–0052, two out of the approximately 30 input adaptors, UA–0030, two out of ten clamps, UA–0034, and could recall having seen only four of the 2-channel microphone selectors, item 4408, without indicating the total number in use during the 1959–1962 period. There is no testimony as to the actual uses during the involved period of items UA–0039, UA–0040, or UA–4122.

attaching to the values found by the appraising officer for these items has not been overcome.

The question remaining is whether plaintiff has established that items 2107 and 3330 are not sound measuring instruments and therefore without the ambit of the Final List designation.

In the absence of commercial designation, express contrary intent of Congress or, in this case, of the publication of guidelines by the Secretary of the Treasury who issued the Final List, tariff terms are to be accorded their common or ordinary meaning. *Enrique Garza* v. *United States*, 66 Cust. Ct. 212, C.D. 4192, 324 F. Supp. 91 (1971). Common meaning is a matter of law to be found by the court which may consult lexicons and scientific and technical authorities in addition to receiving testimony, which is advisory only, of witnesses. *United States* v. *O. Brager-Larsen*, 36 CCPA 1, C.A.D. 388 (1948).

To consider the expression "sound measuring instruments", we note that sound is defined in *Webster's New International Dictionary*, second edition (1951), as:

1. The sensation of hearing; that which is heard; * * *.

and in *Funk & Wagnalls New Standard Dictionary of the English Language* (1942), as:

1. The sensation produced through the organs of hearing.

It is a well known fact that the frequency range of sound or audibility is from about 20 to 20,000 cycles per second,[7] and that when a solid body vibrates at frequencies ranging from 20 to 20,000 cycles per second it will produce the sensation of sound.[8]

---

[7] "Sound

\* \* \* \* \* \* \*

The word sound is sometimes applied only to disturbances that produce an auditory sensation, a definition which is generally confined to nonscientific usage. For example, the scientist would say, 'That sound is inaudible,' while the layman would say, 'There is no sound.' Sound waves having frequencies above the audible or sonic range, that is, above about 20,000 cycles per second (cps), are termed ultrasonic waves; those with frequencies below the sonic range, that is, below about 16 cps are called infrasonic waves * * *."
[McGraw-Hill Encyclopedia of Science and Technology (1966), Vol. 12, page 509.]
   "SOUND : popularly, any disturbance of air, ground, or water that can be heard * * *.

\* \* \* \* \* \* \*

* * * The average human ear is most sensitive from 3,000 to 4,000 cycles/sec, though there is not much difference from 500 to 5,000. The full range of audibility is about 20 to 20,000 cycles/sec, but deafness to the higher frequencies usually sets in as an individual gets older, and any degree of deafness may affect any portion or all of the spectrum at any age." [The Harper Encyclopedia of Science (1963), Vol. 4, pages 1097–1098.]
   "AUDIO FREQUENCY. This term refers to the range of frequencies to which the human ear will respond. While the response of the ear varies from person to person, the range is approximately 20–20,000 cycles per second. Below 20 cycles the sound is normally heard not as a note, but as individual pulses. Most persons are unable to hear above 15,000 cycles, but a few people can hear even above 20,000. (L.R.Q.)" [Van Norstrand's Scientific Encyclopedia, second edition (1947), page 126.]

[8] "Vibration
   The term used to describe a continuing periodic change in the magnitude of a displacement with respect to a specified central reference. * * *

\* \* \* \* \* \*

Mechanical vibration. This is the term used to describe the continuing periodic motion of a solid body at any frequency. When the rate of vibration of the solid body ranges between 20 and 20,000 cycles per second (cps), it may also be referred to as

As items 2107 and 3330 are limited to providing frequency analyses in this range of 20 to 20,000 cycles per second (exhibits 2–H, page 63; 2–I, page 37), and item 2107 "has been designed especially as a narrow band sound and vibration analyzer * * * " (exhibit 2–I, page 38), it is not unreasonable to infer that their primary if not sole purpose is to measure sound. In fact, the B & K Instruments catalogue states, page 41: [9]

> When employing one or more of the B & K Condenser Microphones in conjunction with the Frequency Analyzer Type 2107 a *complete equipment is obtained for high precision measurement or analysis of sound.* * * * [Emphasis supplied.]

The fact that an instrument can only measure sound through the medium of a sensor, or electrical converter [10] does not, in my judgment, remove it from the status of sound measuring equipment if its ultimate purpose is to measure and analyze the characteristics of the sound wave. Nor does its ability, in conjunction with the appropriate transducer, to measure other forms of motion within the sonic range remove it from the status of sound measuring equipment. Accordingly, I find that plaintiff has failed to establish that items 2107 and 3330 are not sound measuring laboratory instruments.

### Findings of Fact

1. That the merchandise involved herein consists of the following electronic instruments and parts manufactured by Bruel & Kjaer, Copenhagen, Denmark, and exported from that country from 1959 through 1962: 3322, audio frequency response and spectrum recorder; 3311, 3313, audio frequency spectrum recorders; 2111, 2112, 2141, audio frequency spectrometers; 1611, 1612, ⅓ octave filter sets;

---

an acoustic vibration, for if these vibrations are transmitted to a human ear they will produce the sensation of sound (*see* MECHANICAL VIBRATION). * * *" [McGraw-Hill Encyclopedia of Science and Technology (1966), Vol. 14, page 311.]

"VIBRATION: the periodic displacement, usually relatively small, of a body from a reference position. Vibration implies that when the body is displaced there is a restorative force; and by virtue of the body's mass and restorative force, the body accelerates (see NEWTON'S LAWS OF MOTION). * * * Since any force produces some displacement, any force applied to any body (especially to a body of high ELASTICITY) lends to cause vibration. If a portion of the body's energy (the sum of the kinetic energy and potential energy of the body) is transmitted to another medium, waves are set up. Thus, a reed vibrating at an audible frequency (approximately 20 to 20,000 cycles/sec) sets up audible sound waves. * * *" [The Harper Encyclopedia of Science (1963). Vol. 4, pages 1229–1230.]

[9] The entire catalogue (exhibit 2 for identification) was originally offered into evidence as being "of considerable assistance to the court in obtaining, if it wishes, the more complete details about each article that is here involved." Although plaintiff did not include page 41 in its subsequent offering, it is appropriate as a technical reference source to aid the court in ascertaining whether the subject merchandise comes within the common meaning of "sound measuring". See *United States* v. *Davies, Turner & Co.*, 16 Ct. Cust. Appls. 50, T.D. 42719 (1928).

[10] The witness testified that the analyses and recording instruments, including items 2107 and 3330, do not measure the characteristics of sound or other forms of motion such as vibration and turbulence, directly, but utilize an electrical converter or sensor, such as a microphone, which converts the motion energy to an equivalent electrical energy which takes the form of an electrical signal. The analyses instruments, using the appropriate sensor, measure the electrical signal operating within their frequency range.

1619, extension filter set; ZS–0146, filter chassis; 2603, 2604, microphone amplifiers; 3330, narrow band spectrum recorder; 2107, frequency analyzer; 2612, 2613, 2615, cathode followers; 4131, 4132, 4133, 4134, condenser microphone cartridges; 4408, two channel microphone selector; UA–0030, input adaptor; UA–0034, flush mounting; UA–0039, extension connector; UA–0040, probe microphone set; UA–0051, UA–0052, nose cones; 4122, floor stand; JJ–2612, input adaptor.[11]

2. That all of the involved articles were found by the appraiser to be on the Final List, issued by the Secretary of the Treasury, T.D. 54521, under the provision for "Instruments and parts, laboratory, sound measuring".

3. That the articles were appraised on the basis of foreign value, as defined in section 402a(c), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. That the record herein establishes that items 3322, 3311, 3313, 2111, 2112, 2141, 1611, 1612, 1619, ZS–0146, 2603, and 2604 are not chiefly used for laboratory purposes and therefore do not come within the Final List designation: "Instruments and parts, laboratory, sound measuring".

5. That all remaining items covered by the appeals herein are included in the Final List, issued by the Secretary of the Treasury, T.D. 54521, under the provision for "Instruments and parts, laboratory, sound measuring".

6. That items 3322, 3311, 3313, 2111, 2112, 2141, 1611, 1612, 1619, ZS–0146, 2603, and 2604 were freely sold in the principal market of Denmark, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States at the invoice unit prices, net, packed, less a proportionate part of the items marked "X" in red ink on said invoices.

### Conclusions of Law

1. That export value, as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for valuation of items 3322, 3311, 3313, 2111, 2112, 2141, 1611, 1612, 1619, ZS–0146, 2603, and 2604; and that said value is represented by the invoice unit prices for each item, net, packed, less a proportionate part of the items marked "X" in red ink on said invoices.

2. That plaintiff has failed to rebut the presumption of correctness attaching to the appraised values of all other articles covered by the

---

[11] Plaintiff has abandoned its claims with respect to the following: all merchandise covered by R63/2365 and R63/2852 (brief, page 3) ; item UA–0033, electrostatic actuator, in R63/2020 and other appeals herein (brief, page 3) ; item 4002 in R63/2852, and any other appeals herein ; items 4142, microphone calibration apparatus, and 4131, condenser microphone, when imported in combination, in R63/2967, and other appeals herein ; items 4141, microphone calibration apparatus and 4131, when imported in combination, in R63/1857, R63/1860, and other appeals herein.

consolidated appeals herein; and that foreign value as defined in section 402a(c), Tariff Act of 1930, as amended, *supra*, is the proper basis for determination of the value of said articles, and that the values of the said articles are the appraised values.

Judgment will be entered accordingly.