(A.R.D. 313)

THE A. W. FENTON CO., INC. *v.* UNITED STATES

---

[4] A case presenting a factual situation very similar to that in *Greb Industries* is *J. L. Wood* v. *United States*, 68 Cust. Ct. 259, R.D. 11766, 340 F. Supp. 1398 (1972) (application for review pending). In that case, the court, following *Greb Industries*, held that the American Subsidiary was a purchaser from, rather than a selling agent of, its Canadian parent corporation.

First Division, Appellate Term

Entry Nos. 2437, etc.

(Decided April 20, 1973)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the appellant.
*Harlington Wood, Jr.*, Assistant Attorney General (*Jordan J. Fiske*, trial attorney), for the appellee.

Before WATSON, MALETZ and RE, Judges

RE, Judge: In this application for review appellant appeals from the decision and judgment of the trial court in *The A. W. Fenton Co., Inc.*, v. *United States*, 67 Cust. Ct. 519, R.D. 11755 (1971), which upheld the government's appraised values on some of the imported articles in litigation, and sustained the importer's claimed values on other merchandise.

The articles, which had been imported at various times during the period 1959 through 1962, were appraised on the basis of foreign value (section 402a(c) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956). Section 402a(c), as amended, provides:

"(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States."

The appraisal was predicated upon the appraising officer's finding that the merchandise came within the description, "Instruments and parts, laboratory, sound measuring", which appears on the Final List issued by the Secretary of the Treasury (T.D. 54521) specifying articles subject to appraisement under section 402a, Tariff Act of 1930, as amended.

Appellant claimed that the imported items were not on the Final List; that the proper basis of appraisement was export value as defined in section 402(b), Tariff Act of 1930, as amended. Section 402 (b), as amended, provides:

"(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States."

Appellant also claimed that the export values were represented by the invoice unit prices, net, packed, less a proportionate part of certain nondutiable items marked "X" in red ink on the invoices under appeal.

It was stipulated that, if the court finds that some, or all, of the articles herein are not described on the Final List, then there is an export value for the merchandise as defined in section 402(b), as amended, and as represented by the unit prices set forth on the invoices, net, packed, less a proportionate part of the items marked "X" in red ink on the invoices.

Appellant had contended at the trial that two categories of articles were involved: 1) instruments and parts which concededly measured sound but were not "laboratory" instruments or parts within the meaning of the tariff statutes, and 2) electronic measuring equipment which was neither "laboratory" nor "sound measuring".

In its opinion the trial court noted that, absent any published guide as to the meaning and scope of the Final List term, "Instruments and parts, laboratory, sound measuring", it would be appropriate to utilize, insofar as possible, the long settled rules applicable to the classification of "laboratory instruments". The court stated (67 Cust. Ct. 521–22):

"The term 'laboratory instruments' has been construed as implying use for laboratory purposes. *R.J. Saunders & Co., Inc.* v. *United States*, 45 CCPA 87, C.A.D. 678 (1958); the Customs Court has indicated that 'laboratory purposes' refers to use for experiment or study. *Westinghouse Electric Corporation* v. *United States*, 55 Cust. Ct. 271, C.D. 2589 (1965); *The A. W. Fenton Co., Inc.* v. *United States*, 49 Cust. Ct. 242, Abstract 67085 (1962). This court's construction of the term was noted without comment by the court of appeals without disturbing the same in *J. J. Boll, et al.* v. *United States*, 55 CCPA 86, 88, C.A.D. 937 (1968), and it appears to be a precedent of this court. The controlling consideration is therefore not the place where the merchandise was used but the purpose for which it was used. *Schick X-Ray Co., Inc.* v. *United States*, 62 Cust. Ct. 97, C.D. 3689, 295 F. Supp. 302 (1969).

"Furthermore, as the term in issue has been held to be a 'use' provision, classification thereunder is predicated upon a finding that the merchandise was chiefly used for laboratory purposes. In challenging the finding, it is plaintiff's burden to establish the contrary by competent evidence. *Schick X-Ray Co., Inc.* v. *United States, supra; J. E. Bernard & Co., Inc.* v. *United States*, 44 Cust. Ct. 315, Abstract 63712 (1960).

"As the appraiser's finding of value is presumptively correct, 28 U.S.C. § 2633, plaintiff has assumed the burden of establishing either (1) that the analyses and recording instruments are not chiefly used for laboratory purposes, or (2) that all of the articles at bar are not sound measuring instruments within the meaning of the Final List."

Proceeding to a detailed consideration of the evidence, the trial court found: (1) that appellant had failed to overcome the presumption of correctness attaching to the appraised values of the sound measuring instruments and parts; (2) that the evidence failed to show that two articles in the second group of instruments, namely, items 2107, a frequency analyzer, and 3330, a narrow band spectrum recorder which incorporates the 2107, were neither "laboratory" nor "sound measuring" instruments, as claimed; and (3) that the un-

contradicted evidence elicited as to the remaining articles established *prima facie* that they were not chiefly used in the laboratory, and were therefore outside the purview of the cited Final List description. Accordingly, the appraised values were sustained as to all articles except those in this last group.

The appeal herein, which covers all items as to which the trial court upheld the appraised values, except item 3330, does not challenge the court's interpretation of the term "laboratory instruments", as implying use for laboratory purposes for experiment or study, or its statements as to the requisite proof for establishing such use. Rather, the appellant disputes the court's findings that appellant failed to establish that the subject articles were chiefly used for other than laboratory purposes, and that item 2107 does not measure sound.

This court agrees with the trial court's construction of the term "laboratory instruments" and its statement that—

> "* * * chief use is a question of actual fact which must be established on the basis of positive testimony representative of an adequate geographical cross section of the country, *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953), with respect to the use by users as a whole of the particular type of commodity involved at or immediately prior to the time of importation, *United States* v. *Gardel Industries*, 33 CCPA 118, C.A.D. 325 (1946), and not upon the actual use of the shipment in issue. *United States* v. *Spreckels Creameries, Inc.*, 17 CCPA 400, T.D. 43835 (1930)."

Thus this court must consider and weigh the evidence of record, pertinent to the merchandise involved in this appeal, to determine whether the trial court's findings were made in accordance with the weight of the evidence. *United States* v. *Rodier, Inc.*, 23 CCPA 336, T.D. 48196 (1936) ; *Golding Bros. Co., Inc.* v. *United States*, 21 CCPA 395, T.D. 46926 (1934).

The sole witness, Mr. James W. Day, president and general manager since 1958 of B & K Instruments, Inc., the consignee herein, testified that his company imports and markets the subject articles, which are manufactured by Bruel & Kjaer of Denmark; that he has had to know his customers' requirements and how his equipment would meet their needs; and that "unfortunately" he sells his merchandise in competition with others. During the period 1959 through 1962, the witness took a demonstration van around the country several times to demonstrate and sell his equipment which he also saw in operation after purchase. Mr. Day stated that these instruments were primarily used in maintaining quality control of manufactured items; in establishing specifications for products being designed; and in preventive maintenance of operating equipment. Only three to five percent, he main-

tained, were used for the laboratory function which he defined as "experimental study and scientific research".

The witness described the sound measuring equipment as follows:

Item 4408, a two channel microphone selector, is used with item 2304, a level recorder (not involved in this case) which records electrical signals.[1] Item 4408 enables the user to switch alternatively from one microphone to another for the recording of these signals. Its main function, according to Mr. Day, who saw it in use at the Cedar Knolls Testing Laboratory in New Jersey to test customers' panels and in two companies in Kansas and Ohio, is "in the testing of transmission loss of sound through a wall or panel." He did not indicate the total number in use during his tour of the country.

Items 4131, 4132, 4133 and 4134 are condenser microphone cartridges which convert air movement, i.e., sound, into an electrical signal for measurement purposes, and items 2612, 2613 and 2615 are cathode followers which are used with the microphone cartridges to make a complete microphone. Item JJ2612, an input adaptor, is used with the cathode follower in place of the microphone cartridge. The witness saw approximately 15 out of 250 of the cartridges and ten of the approximately 200 cathode followers and input adaptors which were in operation during 1959 through 1962. They were being used in quality control and preventive maintenance.

Mr. Day also described the UA series, which consists of various microphone accessories. The UA–0030, an input adaptor, is screwed onto the cathode follower in order to accommodate a smaller microphone. The witness saw two being used to measure sound transmission out of the "approximately 30" in operation during 1959–1962. The UA–0034, a flush mounting, holds a microphone in position so that its diaphragm is flush with a surface while it measures air turbulence. Of the approximately ten in use during the same period, the witness saw two used in wind tunnels in California and Alabama to measure air turbulence flowing along the air frame skin.

Items UA–0051 and UA–0052 are nose cones used with microphones to give them an aerodynamic shape and reduce turbulence and noise when measuring sound in wind tunnels. The witness saw five of the 50 in use during 1959 through 1962: for duct measurement in California and New York; in the ARO wind tunnel in Alabama; for measure-

---

[1] The model 2304, which has been imported both as a separate unit and in combination with frequency analyses instruments such as audiospectrometers, was held in the earlier case of *The A. W. Fenton Co., Inc.* v. *United States*, 49 Cust. Ct. 242, Abstract 67085 (1962), to have been erroneously classified under the provision of paragraph 360, Tariff Act of 1930, for "scientific and laboratory instruments * * *", as plaintiffs had established that the majority were not used for laboratory purposes. That case, however, dealt with the use of level recorders imported prior to the period relevant herein.

ment of air passing by vehicles at the Aberdeen Proving Grounds; and in measuring jet engine noise in Ohio.

There is no testimony of record as to the actual uses of items UA–0039, an extension connecter; UA–0040, a probe microphone kit used with a microphone to measure sound in inaccessible places such as the nose, throat and ears; and of item UA–4122, a heavy-duty microphone floor stand.

With respect to the foregoing sound measuring items, the trial court found that, although the witness had testified to encountering "hundreds of instances in which these units were used for practical commercial applications", his "conclusory statement * * * [did] not constitute substantial evidence which would justify setting aside the appraiser's findings herein". Hence, the trial court concluded that the details furnished regarding his observations as to the uses of the various articles were "too meagre to substantiate plaintiff's claims as to chief use."

After carefully reviewing the record, this court agrees with the conclusion of the trial court, and affirms its decision. This court, which has not had the trial judge's opportunity to observe the witness and to assess his testimony at first hand, is compelled to note that Mr. Day makes the oft reiterated claim of practical commercial uses for the articles at bar. The evidence adduced, however, is not sufficient to support a finding that the appraiser erred, and that the importations are chiefly used for nonlaboratory purposes.

Turning to specific examples, it is not at all certain, without additional evidence, that the two channel microphone selector, item 4408, is not chiefly used, as found by the appraiser, for laboratory purposes. The court is unable to conclude, for instance, that the testing performed at the Cedar Knolls accoustical laboratory or the other two places mentioned by the witness was not part of an experimental project in the study and development of new materials or processes. The holding in *The A. W. Fenton Co.* case,[2] that the level recorder employed with item 4408 is chiefly used for practical or commercial purposes, does not militate against a finding that it may also be used in conjunction with a specific instrument, such as the microphone selector herein, for experimental research or study. Moreover, as noted, the testimony in that case involved a different time period.

The findings with respect to item 4408 are equally applicable to the two input adaptors, item UA–0030, which the witness had seen used to measure sound transmission.

On the oral argument, appellant's counsel complained of an "inconsistency" in the trial judge's holding with respect to the microphones and microphone accessories, in that he had allegedly found that these

---

[2] See footnote 1.

articles were used "only with" audio frequency spectrometers (items 2111, 2112 and 2141) which he had held in the same opinion were not chiefly used for laboratory purposes. This court believes that counsel is mistaken. The trial court made no such statement as to the use of the imported microphones and accessories with the aforementioned imported Bruel & Kjaer instruments. A careful reading of this lengthy and complex record fails to disclose any statement by plaintiff's witness that either the involved condenser microphone cartridges and cathode followers, or their accessories, are used exclusively, or even chiefly, with the Bruel & Kjaer analyses instruments.[3] Mr. Day's testimony pertained to the use of item 4408 with the level recorder which is imported both separately and as one of the units in the audio frequency spectrometers.

Indeed, counsel's suggestion that the microphones and accessories are used only with Bruel & Kjaer measuring instruments is controverted by the B & K Instruments catalogue, printed and published in Denmark by the manufacturer, which states (exhibit 2–K, pages 121–123):

> "A complete microphone consists of a microphone cartridge and a cathode follower, both cylindrical. The cartridge is screwed directly (or by means of a specially designed adaptor if the diameters differ) to the cathode follower housing * * *."

> *       *       *       *       *       *       *

> "For separate operation of the microphones *with other equipments* [sic] the battery driven Cathode Follower Type 2630 and the Microphone Power Supply Type 2803 have been designed, which provide the necessary voltages in the same conditions as from [sic] the B & K measuring instruments. [Emphasis added.]"

The catalogue also states (exhibit 2–K, page 124):

> "Finally it should be noted that the Cartridge Type 4132 fulfils the requirements of the American Standard Z 24.8.–1949: Specification for Laboratory Standard Pressure Microphones".

Thus, it would appear from their own catalogue that Bruel & Kjaer are not the only manufacturers of precision microphones and accessories in use in this country. Moreover, it is equally apparent that Bruel & Kjaer microphones and accessories are not limited to use with the analyses and recording instruments produced by that same concern, but are adapted as well to operation with equipment of other manufacturers.

---

[3] The witness testified extensively as to the use of "energy converters", namely, transducers or sensors, with frequency analyses equipment which measure and establish the character of motion. The energy converters are used to convert motion energy, e.g., vibration, sound, turbulence, into an equivalent electrical signal. A microphone is the transducer used to convert sound into an electrical signal for measurement by the analyses instruments. These instruments, using the appropriate sensor, measure the electrical signal operating within their frequency range.

Furthermore, as noted herein, Mr. Day had testified that the subject articles, albeit allegedly of superior quality and in a higher price range, were sold in competition with other similar equipment.

It is well settled that the actual use to which the importation is put is not controlling as to its chief use. *E. Dillingham, Inc.* v. *United States*, 54 CCPA 121, C.A.D. 922 (1967). Nor is testimony as to the use of the identical merchandise produced by the same importer sufficient : it is the use of the particular *class or type* of goods as a whole that is controlling. *Western Importing Company* v. *United States*, 62 Cust. Ct. 231, 297 F. Supp. 181, C.D. 3734 (1969) ; *Atkinson, Haserick & Co., Inc.* v. *United States*, 52 Cust. Ct. 215, C.D. 2463 (1964). In this aspect of the case the record is totally devoid of any testimony as to the uses of competitive articles of the same class or kind as that involved herein during the period in issue.

Turning to item 2107, a narrow band audio frequency analyzer, we note the statements in the B & K Instruments catalogue (exhibit 2–I, pages 37, 38) that that article is—

"Designed for analyses and linear measurements in mechanical, acoustical and electronic research and production control." and that—

"It has been designed especially as a narrow band sound and vibration analyzer but may be used for any kind of frequency analysis and distortion measurement within the specified frequency range."

The witness conceded that item 2107 is used in mechanical, acoustical and electronic research in addition to other specified uses.

After weighing all the evidence of record as to the uses of this article, the court does not find that the trial judge, who observed the witness and heard his testimony, erred in holding that appellant had failed to overcome the presumptively correct finding that it is chiefly used for laboratory purposes.

Furthermore, the court agrees with the finding below that the 2107, which "has been designed especially as a narrow band sound and vibration analyzer * * *", and is limited to performing analyses in the audio frequency range of 20 to 20,000 cycles per second (exhibits 2–H, page 63 ; 2–I, page 37), is used to measure sound. Its use with a condenser microphone to measure or analyze sound (the latter being necessary to convert the sound to an electrical signal) places it squarely in the realm of sound measuring equipment. As the trial court observed (67 Cust. Ct. 527) :

"The fact that an instrument can only measure sound through the medium of a sensor, or electrical converter does not, in my judgment, remove it from the status of sound measuring equipment if its ultimate purpose is to measure and analyze the characteristics of the sound wave. Nor does its ability, in conjunction

with the appropriate transducer, to measure other forms of motion within the sonic range remove it from the status of sound measuring equipment. Accordingly, I find that plaintiff has failed to establish that items 2107 and 3330 are not sound measuring laboratory instruments."

For the reasons stated, the findings of fact and conclusions of law with respect to the merchandise on appeal are adopted and incorporated by reference. Judgment affirming the decisions below will be entered accordingly.