**ARTMARK CHICAGO, LTD.**

v.

**UNITED STATES.**

C.D. 4654, Court No. 73–3–00816.

United States Customs Court.

June 7, 1976.

Schwartz & . Lidstrom, Chicago, Ill. (Thomas J. O'Donnell, Chicago, Ill., of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen., Washington, D. C. (Saul Davis and Glenn E. Harris, New York City, trial attys.), for defendant.

FORD, Judge:

The question presented in this case pertains to the proper classification, for customs duty purposes, of plastic horse figures approximately 10 inches high, composed in chief value of plastic, having removable plastic saddles and metal reins. The merchandise was classified as toy figures of animate objects under provision of item 737.40, Tariff Schedules of the United States, as modified by T.D. 68–9, and assessed with duty at the rate of 21 or 17.5 per centum ad valorem depending upon the date of entry.

Plaintiff contends the horses are not toy figures but are in fact used for ornamental decoration and display. Accordingly, it is contended they are properly subject to duty at the rate of 10 or 8.5 per centum ad valorem as figurines of plastics as provided for in item 773.10, Tariff Schedules of the United States, as modified by T.D. 68–9.

The pertinent statutory provisions are:

Item 737.40

Toy figures of animate objects (except dolls):

Not having a spring mechanism:

\* \* \* \* \* \*

Not stuffed:

\* \* \* \* \* \*

Other .................. 17.5% or 21% ad val.

Item 773.10

Plaques and figurines, of rubber or plastics ..................... 8.5% or 10% ad val.

*Headnote 2, Subpart E, Part 5, Schedule 7, Tariff Schedules of the United States*

2. For the purposes of the tariff schedules, a "*toy*" is any article chiefly used for the amusement of children or adults.

*General Interpretative Rule 10(e)(i)*

(e) in the absence of special language or context which otherwise requires—

(i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i. e., the use which exceeds all other uses (if any) combined;

The record consists of the testimony of four witnesses called on behalf of plaintiff and the receipt in evidence of twelve exhibits. Defendant introduced the testimony of nine witnesses and offered five exhibits in evidence.

Mr. Joseph Yashon, vice president and controller of Artmark Chicago, Ltd., testified he is familiar with all matters dealing with customs and identified the horse involved which was received in evidence as plaintiff's exhibit 1.

Plaintiff next called Mr. Alfred Ellis, vice president in charge of sales of Thunderbird Products Co. of Chicago. His duties include promotional work and attending shows as well as covering five states doing promotional sales work. Mr. Ellis was familiar with exhibit 1 as his firm purchases said item from Artmark. He has sold exhibit 1 in resort areas and western shops for 6 to 8 years. Based upon his experience in sales, exhibit 1 is sold in the giftware sections of souvenir shops, along with statues and ornamented items, or as collectors' items in western shops.

The witness identified a catalog of his company for 1974–1975 which was received in evidence as plaintiff's exhibit 2. On *voir dire*, Mr. Ellis stated that in the 1971–1972 catalog exhibit 1 was depicted in the giftware section. The catalog was divided in the same sections as in exhibit 2. He further indicated that approximately 4,500 catalogs are distributed throughout the United States each year. Mr. Ellis identified exhibits 3, 4, and 5 which he purchases from plaintiff and sells to the same buyers, i. e., giftware sections of stores. In his opinion they are used for collecting or ornamental purposes. The opinion of the witness on use is based upon the purchasers to whom he sells the item.

Mr. Ellis identified exhibits 6 and 7 having purchased them from Breyer Molding Co. He sells them to the same buyers as exhibits 1, 3, 4, and 5. They are sold by him to gift shops, the souvenir trade and western stores. The witness has seen such articles in windows, on televisions, on mantels, as well as an ornament on the back window or hood of a car. In his opinion the horses are collectible items used for display or ornamentation. The witness identified a brochure entitled "Breyer's Animal Creations" which was received in evidence as plaintiff's exhibit 8. Mr. Ellis identified on pages 2 and 3, items 57 and 112 which he testified represented exhibits 6 and 7. Exhibit 1, being an import, is less expensive and would retail for approximately $5 while exhibit 6 would retail between $7 and $8 while exhibit 7 would retail between $6 and $7. The saddle on exhibit 1 is a western style saddle which makes it more pleasing

to those who want a western horse as part of their collection.

Mr. Ellis identified exhibit 9, a plastic donkey which he has sold for approximately 10 years. This item was sold by him to the same type of stores, i. e:, gift shops and western stores. The same evidence was adduced as to plaintiff's exhibit 10, a cow, and plaintiff's exhibit 11, a dog. The witness sold the reindeer, plaintiff's exhibit 12, for approximately 15 years and was of the opinion it is used for decorative, ornamental or collectible purposes.

On cross-examination, Mr. Ellis testified he sold exhibit 1 to gift shops in resort areas and that these shops also sell toys. Mr. Ellis' only information as to use is based upon information received from his customers. The witness did not know of his own personal knowledge the particular individuals who purchased the horse from the gift shop, nor did he know how these purchasers used the horse. Mr. Ellis did however see articles such as involved used to make lamps, and on the back window of automobiles.

Mr. Arthur Lozins, a salesman for plaintiff corporation since 1955, was then called on behalf of plaintiff. Mr. Lozins testified that he sells to two classes of customers, wholesalers (jobbers) and retailers. The wholesalers include florist jobbers, souvenir jobbers and carnival jobbers. The retailers include mail-order houses, large retail florists, discount stores and chain stores which are for the most part in the eastern two-thirds of the United States which area he personally covers.

In the opinion of witness Lozins, plaintiff's exhibit 1 is primarily used as a decorative item by horse collectors and fanciers. He is a horse owner and observed plaintiff's exhibit 1 for sale at a retail stand at a horse show for sale to horse fanciers.

On cross-examination, Mr. Lozins stated that retail stores which sell plaintiff's exhibit 1 also sell toys but that in his opinion less than 5 percent of the horses are displayed or sold with toys. He personally did not call on toy jobbers because in his experience he found they did not buy articles such as plaintiff's exhibit 1 in sufficient quantities to justify the time spent in selling such purchasers. Mr. Lozins testified that he does not of his own personal knowledge know how the ultimate purchaser uses articles such as plaintiff's exhibit 1.

Mr. Henry Berg was then called to testify on behalf of plaintiff. Mr. Berg is the owner of Berg Sales Co. which is a general wholesale merchandiser. He is also president of, and virtual owner of, Federal Supply Corp. which is a retail discount store. Both are located in downtown Chicago and he has been with them since 1937. Mr. Berg carries and sells plaintiff's exhibit 1 and for 20 years has sold horses of this type. Based upon his experience, Mr. Berg is of the opinion that such horses are used only for decorative purposes. The largest users, according to Mr. Berg, are teenage girls who use them to decorate their bedrooms. Plaintiff's exhibit 1 is offered for sale by him in his store along with other decorative items.

On cross-examination, Mr. Berg stated he sells toys in his wholesale company, but the store is divided into sections and plaintiff's exhibit 1 is displayed in a totally different section than the toys. While he has not personally observed the use of plaintiff's exhibit 1, the customers often volunteer their reasons for purchasing such merchandise.

The defendant called as its first witness Mr. Richard Mazursky, an employee of Montgomery Ward & Co. for 8 years. During the time period in question the witness was a toy buyer for his company. Mr. Mazursky is familiar with the manner in which Montgomery Ward advertises and sells its merchandise throughout the United States, except Hawaii. Toys are usually displayed in the toy section of the catalog and in the toy department of its retail outlets. The witness was familiar with defendant's exhibit A (Johnny West "Satan" Horse and Saddle) and exhibit B (Johnny West Rider "Captain Maddox" Doll) having purchased them for Montgomery Ward. Defendant's exhibit A was sold through catalog and was advertised in the toy section.

Defendant's exhibit B was sold in the retail stores and sold in the toy section. Both articles in his opinion are toys.

The witness was also familiar with the Breyer horses, plaintiff's exhibits 6 and 7, having purchased similar horses for Montgomery Ward. Exhibits 6 and 7 were sold in the toy section of Montgomery Ward stores. In his opinion exhibits 6 and 7 are toys.

On cross-examination, Mr. Mazursky testified that all items sold in the toy section are not necessarily toys. Exhibits A and B were sold as sets and not separately. The sets included a horse, saddle and rider. Plaintiff's exhibit 1, according to the witness, had much better detail and had a more aesthetic quality than defendant's exhibits A and B. He also was of the opinion that exhibits A and B had a greater degree of play value than exhibit 1. Mr. Mazursky then stated he had seen horses such as exhibit 1 in his company's offices, in the retail stores and in a home. The horse he observed in the home was displayed as a collector's item on a bookshelf. Items such as exhibit 1 were exhibited for sale by Montgomery Ward as collectors' items, and when sold in the toy department, they are enclosed in a glass case. The witness had never seen an article such as exhibit 1 used as a toy.

On redirect examination, Mr. Mazursky stated he had seen stuffed animals and dolls on a shelf and he considered them toys. When read the definition of toy contained in the Tariff Schedules of the United States, he stated plaintiff's exhibit 1 was a toy.

On recross examination, the witness stated the predominant or chief market for articles such as exhibit 1 is for girls in the 9- to 14-year-old age group as display items. A market for adults also exists.

Defendant next called Mr. John Striet, a toy buyer for Sears Roebuck & Co. Mr. Striet testified that Sears Roebuck & Co. sold defendant's exhibits A and B and in his opinion they are toys. They are advertised in the toy section of his company's catalog and sold in the toy department of its retail stores. Sears Roebuck catalog sales and stores are located in all 50 states.

On cross-examination, Mr. Striet stated that not everything sold in the toy department are toys. He was of the opinion that plaintiff's exhibit 1 is different than exhibit A in size, accessories, play value and fragility. He has never seen exhibit 1 in use, but it was his opinion that it is chiefly used for display and ornamentation. Exhibit 1 has greater aesthetic appeal. Exhibit A in the opinion of Mr. Striet is used by boys in the 4- to 12-year-old age group.

Dr. Rolf Peterson was called on behalf of defendant. Dr. Peterson holds a doctorate in psychology and specializes in clinical psychology and developmental psychology. He is an associate professor at the University of Illinois. Dr. Peterson has authored a number of articles relating to children and has coauthored a book utilized at the University of Illinois. He has observed children at play in school settings, in preschool and day care centers as well as in his home and the homes of neighbors.

Dr. Peterson had observed children playing with horses such as plaintiff's exhibit 1 and defendant's exhibit A. The child would pretend to feed it and pull the horse around the room, sometimes placing it under the bed to fantasize a barn setting. The child would play with the horse with or without a doll. The child would remove the saddle and manipulate the reins. The only aesthetic value a child finds in a replica of a horse is that it looks like a horse. The fact that exhibit 1 has less paraphernalia than defendant's exhibit A enhances the play value of exhibit 1 for children in the 3- to 5-year-old age group. While the witness has seen horses on a shelf in a child's room, they were in his opinion in a state of nonuse but are primarily a play object. According to Dr. Peterson, collecting is a form of play activity for a child. Collecting articles as a hobby by adults is in his opinion considered to be a form of amusement.

Dr. Peterson defined a hobby as collecting objects plus having knowledge about the objects the person collects such as the

**1034**

breed of the horse, etc. If an adult collected one or more plastic horses, this use in his opinion would be as a decorative item or figurine. Such a collection as a hobby would be for amusement plus learning.

Mr. Peter Stone, vice president and marketing director of Breyer Molding Co. was then called on behalf of defendant. Mr. Stone's responsibility is for the sales and development of the product line of Breyer Molding Co. He attends two trade shows every year, the Hobby Industry Association Show and the American Toy Fair. Toy and hobby items are displayed at both shows. Mr. Stone is familiar with plaintiff's exhibits 6 and 7 as both are manufactured by his company. These two items, according to Mr. Stone, are shown at both the hobby show and the toy fair. Sales of the Breyer horses are directed toward the young-girl age group. Mr. Stone was of the opinion that the Breyer horses such as exhibits 6 and 7 were sold in the manner depicted by defendant's exhibit E as collectors' items and used for play.

Mr. Stone believed a hobby item is an item which involves a youngster being creative and occupying his time with an article for his amusement, pleasure or fun. The witness has observed exhibits 6 and 7 used by children in setting up dioramas, farm scenes or racetrack scenes. This use could be analogized to the use of Barbi Dolls with their various accessories. The majority of such articles are used for play or amusement.

On cross-examination, Mr. Stone was of the opinion that collecting of horses does not militate against the article being primarily used by children for amusement purposes. The witness has seen horses on a shelf but he considered them in nonuse and the primary purpose was as a toy.

Defendant additionally produced the testimony of five children ranging from 8 years of age to 12 years of age. Their testimony related to the use of exhibit 1 or similar items by them for amusement and play.

■ Based upon the record as made, plaintiff contends it has established the involved merchandise to be properly subject to classification under item 773.10, Tariff Schedules of the United States, as figurines of plastics. In order to establish this claim, plaintiff must overcome the presumption of correctness attaching to the classification by the district director of customs. This presumption which is now statutory, 28 U.S.C. § 2635 (1970), imposes upon plaintiff a dual burden which in this instance requires proof establishing that the involved horses are not chiefly used for the amusement of children or adults,* and further establishing the involved horses to be figurines.

■ Plaintiff's task in overcoming the first burden imposed upon it is to establish the involved horses are not chiefly used for the amusement of children or adults. General Interpretative Rule 10(e)(i) defines chief use as being the use which exceeds all other uses. Chief use is a question of fact which must be established on the basis of positive testimony representing such use throughout the United States. *L. Tobert Co., Inc., American Shipping Co. v. United States*, 41 CCPA 161, C.A.D. 544 (1953). Such evidence must relate to use of the particular class or kind of article involved at or immediately prior to the time of importation.

The evidence adduced by plaintiff falls short of negating the chief use attaching by virtue of the presumption of correctness. The witnesses called for the most part had not observed use and testified generally as to the type of store or department to which they sold the horse in question.

■ The court is of course aware of the general principle that an importer who testifies as to the purpose of manufacture and the market in which it is sold may establish a *prima facie* case. *The A. W. Fenton Co., Inc. v. United States*, 67 Cust.Ct. 519, R.D. 11755 (1971), aff'd, 70 Cust.Ct. 286, A.R.D. 313 (1973); *Davis Products, Inc., Frank M. Chichester v. United States*, 59 Cust.Ct. 226,

---

* Headnote 2, Subpart E, Part 5, Schedule 7, TSUS.

C.D. 3127 (1967). In these cases defendant offered evidence of actual use which refuted the evidence presented by plaintiff's witnesses who were sellers.

In the case of *S. Y. Rhee Importers v. United States,* 61 CCPA 2, C.A.D. 1108, 486 F.2d 1385 (1973), the appellate court in reviewing the manner of sale as it relates to chief use made the following observation:

> This leads to appellant's primary argument that the lower court found chief use as a greeting card. Great emphasis is placed on a statement by the Customs Court that "[t]he evidence preponderantly establishes that the imported inflatable articles are sold and purchased *in the same manner* that ordinary greeting cards are sold and purchased." [Emphasis quoted.] Appellant then argues that the Customs Court was, therefore, inconsistent in finding chief use as a greeting card and then classifying the imported items as toys. Such an inconsistency would, of course, be erroneous. However, as quoted above, the Customs Court clearly stated that the chief purpose of amusement "is not refuted by the evidence adduced at trial." Moreover, it said:
>
>> It is relatively of little probative value that the articles are sold at counters that feature "greeting cards" consisting essentially of printed matter, and not by retail stores that sell toys exclusively. There are few stores that any longer have a corner on the toy market.
>
> This court has had occasion to point out that the manner in which an article is bought and sold is not necessarily determinative of its classification. *United States v. Ignaz Strauss and Company, Inc.,* 37 CCPA 32, C.A.D. 415 (1949); *United States v. Ignaz Strauss and Company, Inc.,* 37 CCPA 48, C.A.D. 418 (1949). *Novelty Import Company, Inc. v. United States,* 53 Cust.Ct. 274, Abstract No. 68780 (1964) is also in point. There certain imitation poodle dogs were classified as manufactures of rayon and other synthetic textiles. The importer protested that they were properly classifiable as

toys not specially provided for and presented testimony concerning their display in toy sections of stores and their sale to toy jobbers. In overruling the protest, the Customs Court declared:

> The mere fact that three of the witnesses sold the imported items to toy jobbers and the other witnesses observed them displayed in the toy section of large stores, does not *ipso facto* make the involved merchandise toys since the merchandising medium through which articles may be sold is not always a proper criterion through which to judge the classification of an article. *United States v. Ignaz Strauss and Company, Inc.,* 37 CCPA 32, C.A.D. 415.

By the same token, testimony relating to the sale to giftware departments and western stores does not refute the presumption that the imported horse is chiefly used for the purpose of amusement of children or adults nor does it *ipso facto* establish the involved horse to be a figurine.

The record having failed to overcome the presumption of correctness attaching to the classification, the court must overrule the claim and sustain the classification.

Judgment will be entered accordingly.